| | |
|---|---|
| H. Micheal Wright (#004277) | Steven S. Guy (#009106) |
| Lincoln M. Wright (#020076) | THE GUY LAW FIRM, P.L.L.C. |
| UDALL │ SHUMWAY | 10105 E. Via Linda |
| 1138 N. Alma School Rd., Ste. 101 | Suite 103 |
| Mesa, Arizona 85201 | Scottsdale, Arizona 85258-5326 |
| Phone: 480.461-5300 | Phone:  480.767.3175 |
| Fax:  480.833.9392 | Fax:  480.383.6874 |
| Email:  hmw@udallshumway.com | E-Mail: steve@steveguylaw.com |
| Attorneys for Plaintiffs | Attorneys for Plaintiffs |

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Jacob Benson, an individual; Joseph Benson and Deborah Benson, husband and wife; Kaden Benson, a minor, by and through Jacob Benson, guardian ad litem,<br><br>    Plaintiffs/Judgment Creditors,<br><br>v.<br><br>Casa De Capri Enterprises, LLC, an Arizona limited liability company; John Does 1-20; ABC Corporations I-X; XYZ Partnerships I-X,<br><br>    Defendants/Judgment Debtors<br><br>Continuing Care Risk Retention Group, Inc., a foreign corporation,<br><br>    Garnishee | No. 2:18-cv-0006-DWL<br><br>**PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**<br><br>**(Oral Argument Requested)** |

Plaintiffs Jacob Benson, Joseph Benson, Deborah Benson and Kaden Benson ("Bensons" or "Plaintiffs"), by and through their undersigned attorneys and pursuant to Rule 56, Fed. R. Civ. P. hereby submit their Reply in Support of their Motion for Summary Judgment (*Dkt.* 55)(the "Motion").

**Arizona Law Controls the Interpretation of the CCRRG Policy**

CCRRG's response (*Dkt.* 64)(the "Response") devotes most of its 18 pages of

argument to a red-herring pre-emption defense under the Liability Risk Retention Act (the "LRRA"). And, CCRRG has invited the National Risk Retention Association to submit another 19 pages of argument devoted to that supposed defense. (*Dkt.* 66). The gist of their nearly 40 pages of argument is that state law public policy is preempted by the LRRA. That argument is seriously flawed because whatever the scope of the LRRA's pre-emption of state law might otherwise be, the LRRA expressly says that state law governing the interpretation of insurance contracts is **not** preempted.

> Nothing in this Act shall be construed to affect either the tort law or the law governing the interpretation of insurance contracts of any State ...

15 U.S.C. §3901(b).

This preemption carve-out is clear and unambiguous and it must have been known to the drafters of the LRRA that state law rules of insurance policy interpretation often incorporate principles of public policy. *See e.g., State Farm Mut. Auto. Ins. Co. v. Wilson,* 162 Ariz. 251, 257, 782 P.2d 727, 733 (1989)("When faced with conflicting, reasonable interpretations of a contract, the court should adopt the interpretation that furthers public policy"); *Ponder v. State Farm Mut. Auto. Ins. Co. ,* 129 N.M. 698, 705-706, 12 P.3d 960, 967, 968 (N.M. 2000)("when interpreting insurance policies, as a matter of public policy, ambiguities are generally construed in favor of the insured and against the insurer"); *Garcia v. Truck Ins. Exchange,* 204 Cal. Rptr. 435, 438, 682 P.2d 1100, 1105 (Cal. 1984)(rule of construing ambiguities against the insurer derives from public policy). Thus, it is simply wrong for CCRRG to suggest as it does that this court should ignore public policy in construing CCRRG's so-called "claims paid" policy.

CCRRG's only response to the LRRA "interpretation" carve-out, is to argue that it creates a "loophole large enough to drive a bus through". Response at p. 7. If so, then that gaping hole is of CCRRG's own creation. CCRRG adopted a California originated policy form that included standard Bankruptcy and Conformity to Statute Clauses. It then proceeded to use that same form with those same clauses in every state in which it does

business. And, in doing so, it did absolutely nothing to explain to its insureds, either in its policy form or elsewhere, how the state law mandated bankruptcy clause would apply where an insured has an open claim but cannot continue its membership due to its insolvency or bankruptcy. And, when it told its insureds in its policy that the policy was "amended to conform" to the insured's state statutes "as required under the Risk Retention Act for a Risk Retention Group," it never explained in its policy or elsewhere its position that the LRRA does not require its policy to conform to state law.

### The CCRRG Policy is Ambiguous and Must Be Construed Against CCRRG

Relying heavily on its flawed preemption position, CCRRG mostly ignores the blatant ambiguities in its policy form. In discussing the ambiguity created by the conflict between the Bankruptcy Clause and Continuing Membership Clauses, CCRRG does however argue that the Bankruptcy Clause states that the insured's insolvency or bankruptcy "neither expands nor relieves" CCRRG's obligations. Response at p. 15. Thus, it contends that permitting continuing to pay for the defense of an insolvent and bankrupt insured would supposedly expand CCRRG's obligation in conflict with the Continuing Membership Conditions. Rather than benefit CCRRG's position, this argument illustrates the obvious ambiguity inherent in the policy. On the one hand, CCRRG must concede that the insured's inability to meet its financial obligations to continue membership cannot cause it to lose coverage (e.g. to "relieve" CCRRG from its obligations), but on the other hand CCCRG contends that its coverage obligations only continue so long as the insured is financially able to pay and continue as a member. These two positions are utterly irreconcilable.

CCRRG's interpretation is flawed because at the time that Capri's insolvency and bankruptcy prevented it from continuing to pay the amounts it owed, CCRRG was admittedly obligated to defend Capri. Indeed, it was doing so without any reservation of rights regarding coverage. Thus, by any reasonable interpretation of the Bankruptcy Clause, CCRRG's requirement that Capri continue as a member despite Capri's insolvency; and

- 3 -

CCRRG's withdrawal of its defense because Capri was insolvent, were contrary to the Bankruptcy Clause.  In other words, had Capri been solvent and able to continue paying its premium and deductible obligations, CCRRG would have been required to continue providing a defense and to later indemnify Capri.  It was only because Capri was insolvent and bankrupt that purportedly allowed CCRRG to withdraw its defense and deny coverage.  Under these circumstances, no lay person, untrained in law or insurance and reading the Bankruptcy Clause, would ever understand the policy in that manner.

At a minimum, the Benson's interpretation of the Bankruptcy Clause is a reasonable one which under Arizona law requires the court to examine the purpose of the clause, public policy and the surrounding circumstances.  *Wilson,* 162 Ariz. at 257, 782 P.2d at 733; *Phoenix Control Sys., Inc. v. Ins. Co. of N. Am.,* 165 Ariz. 31, 35, 796 P.2d 463, 467 (1990); *Keggi v. Northbrook Prop. & Cas. Ins. Co.,* 199 Ariz. 43, 46, 13 P.3d 785 (App. 2000).  And, if after considering those factors there is still any doubt as to the meaning of the language, the Court should construe the policy against the insurer who drafted the policy. *Teufel v. American Family Ins. Co.,* 2018 Ariz. LEXIS 187, 419 P.3d 546, 550 (2018).

Addressing the purpose of the clause, it is undisputed that CCRRG borrowed its policy form from a California medical malpractice insurer.  It is also undisputed that California law required such clauses in liability insurance contracts.   Moreover, most states require such clauses and those states that have not required them found that it was not necessary to compel their inclusion because the insurance industry almost uniformly has included them in their liability policies.  (Motion at pp. 6-7).  Thus, the purpose of the Bankruptcy Clause coincides with the public policy behind such clauses.  That purpose and public policy is to protect tort victims, such as the Bensons, and to prevent a windfall to the insurer.  *See, Rosciti v. Ins. Co. of Penn.,* 659 F.3d 92, 98 (1st Cir. 2011)(bankruptcy clause intended to preserve a tort victim's right of recovery when the insured becomes insolvent); *In re Federal Press Co.,* 104 B.R. 56, 63 (N. D. Ind. 1989)(bankruptcy clause embodies the public policy to protect injured victims); *In Re Sudbury, Inc.* 153 B.R. 776, 778 (N.D. Ohio

1993 (Bankruptcy clause intended to prevent economic loss to tort victim and windfall to insurer); *Am. Safety Indem. Co. v. Vanderveer Estates Holding, LLC,* 328 B.R. 18, 25 (E.D.N.Y. 2005)(public policy of bankruptcy clause is to compensate injured parties regardless of the insured's insolvency or bankruptcy). Moreover, while Arizona is one of the few states that has not mandated bankruptcy clauses in all liability insurance contracts, Arizona does have a strong public policy of protecting tort victims. Indeed, the purpose and public policy behind bankruptcy clauses is the same as the public policy embodied in Arizona's anti-nullification statute, A.R.S. §20-1123, to protect tort victims. *See Am. Cont'l Ins. Co. v. Steen,* 151 Wn.2d 512, 91 P.3d 864 (2004)(The purpose of the annulment statute to protect the injured). Thus, both the public policy and purpose of the clause factors strongly militate toward construing the CCRRG Bankruptcy Clause in favor of the Bensons and against CCRRG.

In an effort to avoid the consequences of its ambiguous policy and responding to a "reasonable expectations" argument that the Bensons have not asserted (See Motion at 2), CCRRG contends that its policy form, Subscription Agreement and its various documents and publications explained to Capri the ramifications of the Continuing Membership Conditions. Response at p. 17 and CCRRG's Statement of Facts at ¶¶6-9, 12, 19, 53-58. While CCRRG does not specifically say as much, it appears that CCRRG might be trying to assert that the circumstances of the transaction support its interpretation of the Bankruptcy Clause (that it did not preserve CCRRG's obligations to Capri). Glaringly absent from CCRRG's Response and Statement of Facts, however, is any suggestion that the Continuing Membership Conditions were discussed or explained to Capri or any of CCRRG's insureds in a bankruptcy or insolvency context. Indeed, it is undisputed that CCRRG never explained how the Continuing Membership clauses would work if Capri became financially unable to continue its membership due to its insolvency or bankruptcy. In this regard, Magnolia's President and CCRRG's corporate secretary, Robert Bates, testified as follows:

> Q. (By Mr. Guy) So as you sit here today, you're not aware of any document that addresses a loss of membership and potential loss of coverage for existing claims that specifically addresses the question of whether that will occur in the context of a bankruptcy or insolvency?
>
> THE WITNESS: I'm not aware of a specific document that does that.
>
> \*\*\*
>
> Did any of Magnolia or CCRRG's marketing materials or its website ever specifically address the effect of an insured's bankruptcy or an insolvency on the continuing membership conditions?
>
> THE WITNESS: As indicated previously, I think multiple documentation reflects inability to pay premium, assessment, dues, fees, or a subscription as reasons for cancellation of membership.
>
> Q. (By Mr. Guy) Well, you said something in your answer that I don't think is correct, and I'm going to ask you about that.
>
> A. Sure.
>
> Q. You said it addresses an insured's inability to pay. Would it be more correct to say that those documents that you're referring to expressly address their failure to pay as opposed to inability to pay?
>
> THE WITNESS: That's a -- I would agree with that verbiage. I believe that it's as failure to pay versus inability to pay.
>
> \*\*\*
>
> Are there any documents in CCRRG or Magnolia's marketing materials or on their website that expressly discuss what happens if an insured is unable to pay due to bankruptcy or insolvency?
>
> THE WITNESS: I believe marketing materials, website, etcetera, speak of failure to pay without necessarily identifying the reason there is a failure to pay.
>
> Q. (By Mr. Guy) Okay. Are there any internal memos or e-mails that CCRRG or Magnolia maintains that expressly discuss a failure to pay when it's in the context of an insured's insolvency or bankruptcy?
>
> THE WITNESS: I don't believe there are.

R. Bates Deposition (Plaintiffs' Statement of Facts ("PSOF") Ex. 2) at 88:4-90:24. *See*

- 6 -

*also,* CCRRG's Ex. 1-4, 15-16, none of which discuss the Continuing Membership Conditions in the context of the insured's insolvency or bankruptcy. Accordingly, the overall circumstances of this transaction do not support CCRRG's interpretation. In fact, because CCRRG was in control and could easily have communicated to its insured that coverage for open claims would be lost even if the insured was financially incapable of continuing its membership, this factor also favors the Bensons.

Also, the duty to defend portion of the insuring clause of the CCRRG Policy is ambiguous as to when the duty to defend stops due to a policy cancellation. This is because the language of the Coverage A, Insuring Agreement, subsection 2 (b) states that CCRRG's right and duty to defend ends when, among other things, "*this policy* is cancelled or not renewed for any reason …". (Emphasis added). [PSOF at ¶7]. "This policy" necessarily refers to the policy that was triggered (e.g. the 2012 Policy). However, the 2012 Policy was never cancelled - only the 2013 Policy was cancelled. Nor was the 2012 Policy nonrenewed. Thus, a lay person untrained in law or insurance reading the Insuring Clause would reasonably conclude that the duty to defend would continue if the policy that was in effect when the claim was first made was not cancelled or nonrenewed. Such person could reasonably conclude that the cancellation of a later issued policy would not impair his or her right to an ongoing defense. Thus, CCRRG's withdrawal of Capri's defense under the 2012 Policy due to the 2013 Policy cancellation was improper and contrary to the terms of the 2012 Policy. CCRRG's Response does not address this ambiguity at all [1]

---

[1] As noted, the ambiguities in the CCRRG policy form go well beyond the ambiguous conflicts between the Bankruptcy Clause and the Insuring Agreement and the Continuing Membership Conditions. This reply will not try to restate all of the many ambiguities. *See* Motion at pp. 9-11 for a detailed description of the other ambiguities. In that regard, Bensons do note that CCRRG's response to the PSOF misquotes the definition of "Claims-Paid" by inserting new subparts to that definition that were not included on the actual issued policies. See Plaintiffs Response to CCRRG's Statement of Facts at ¶7.

- 7 -

**The Undisputed Facts Demonstrate that Capri Was Insolvent and Incapable of Continuing Its Membership with CCRRG**

As demonstrated in the Motion and the PSOF, the sole reason that Capri stopped paying its premium and deductible obligations and cancelled its policy was its financial insolvency and financial inability to continue to stay in business and pay CCRRG. *See* PSOF ¶¶24-32, 36-37, 44. In its Response and Statement of Facts, CCRRG half-heartedly argues that Capri cancelled its policy for "business" reasons. CCRRG says:

> It is important to recognize that Capri, as a debtor-in-possession, exercised its business judgment and chose to cancel the CCRRG Policy, despite having approval from the bankruptcy court for a post-petition loan to pay the insurance premiums. SOF ¶ 85. Instead of paying the premiums the court authorized, Capri elected "as a business decision" to stop payment on post-petition premium checks and to cancel the CCRRG Policy.

Response at p. 14.

In making this argument, CCRRG does not refute that the so-called "business" decision to stop paying CCRRG was purely because of Capri's insolvency and bankruptcy. Moreover, the whole premise of this argument is based on snippets of testimony of Capri's CEO, Gregory Anderson, who testified in deposition and declarations that Capri was financially unable to continue to pay CCRRG or even to continue in business. *See* PSOF ¶¶24-32, 36-37, 44 and the Anderson testimony and declarations (PSOF Exhibits 3 and 9). Moreover, the deposition snippets that CCRRG refers to do not negate or undermine Anderson's testimony regarding Capri's financial inability to continue with CCRRG. To the contrary, they are entirely consistent with that testimony.

> Q. BY MR. CIENIAWSKI: Casa de Capri made a business decision to stop paying its insurance premiums, correct?
>
> THE WITNESS: When -- **yes, when it had no money**.
>
> BY MR. CIENIAWSKI: It also made a business decision not to pay the outstanding deductibles related to its insurance coverage?
>
> THE WITNESS: **When it had no money, yes.**
>
> ***

- 8 -

Q. [BY MR. GUY]: Mr. Cieniawski asked you questions about various decisions that were made about who would get paid and who wouldn't get paid during the course of the bankruptcy. Do you recall those questions?

A. Yes**.**

Q. And I think he used terms like you used your "business judgment" and you used your "choice." Do you remember those questions in general?

A. Yes. But you're talking about who would get paid right away when we were trying to make payroll and food costs and medical costs, yes.

Q. Was there really any business judgment involved?

THE WITNESS: **No.**

Q. BY MR. GUY: Was there really any choice that you had at that time?

THE WITNESS: **No**.

Q. BY MR. GUY: And why do you say that there wasn't any business judgment involved when you were making those decisions?

THE WITNESS: Because our obligation was to the safety and health of our patients first and foremost under state law.

Q. BY MR. GUY: And was there any other money besides paying your staff and paying to do the things that were necessary to keep the facility safe to pay insurance premium?

A. **No.**

Q. So to the extent that Casa de Capri was unable to continue paying insurance premium or continue to pay amounts owed for deductibles, was it by choice that it stopped paying those amounts?

THE WITNESS: **No, not really.**

Q. BY MR. GUY: And why is that?

THE WITNESS: **Because the first priority was the health and well-being of the patients and the employees. The patients. And you had to pay the employees for that purpose.**

BY MR. GUY: And there wasn't enough money after that to continue to pay the amount that CCRRG was demanding?

THE WITNESS: **Yes, that's correct.**

\*\*\*

Q. BY MR. GUY: **Were there any -- is there any other reason that Casa de Capri did not continue coverage with CCRRG other than the fact that it was insolvent and bankrupt?**

**A. No.**

[Anderson Depo. (Ex. 3 to PSOF) at 81:9-19, 159:22-161:19, 162:18-22 (emphasis added).

Thus, it is simply fallacious for CCRRG to try to suggest that Capri's policy cancellation was for any reason other than its insolvency and bankruptcy. As demonstrated, the undisputed facts prove that at the time of the cancellation Capri was in default of its payment obligations to CCRRG and out of business, having sold its assets in a bankruptcy sale. Though it may have had early permission from the bankruptcy court to continue paying for insurance, that permission was simply an interim order entered on August 22, 2013 before Capri's asset sale was approved on September 20, 2013 (PSOF Ex. 9 at BENSON_000876-886). Given that Capri had sold its assets, including its lease, furniture and fixtures, there was no possible way it could continue to pay premium to CCRRG for it business it was no longer operating. Any argument to the contrary is simply absurd.

### **The After-Loss Forfeiture of Coverage Is Against Public Policy and Void**

As noted, the CCRRG Policy requires that the policy conform to Arizona law. CCRRG points to the language of the Conformity to Statute clause that states, "as required by" the LRRA as though that is some kind of limitation on the extent to which the policy must conform to state law. Plaintiffs submit that a lay person, untrained in law or insurance, would understand that to mean simply that the LRRA requires the policy to conform to state statutes. Moreover, even if that language was supposed to convey a limitation on the scope of the clause, how is a lay person supposed to know what is or is not required by the LRRA? The policy does not disclose any such information and it is unreasonable to expect insureds to dig into the LRRA and understand what it does or does not require. As such, the only reasonable interpretation of the Conformity to Statute clause is that State Statutes control

over contrary terms in the policy.  At the very least the "as required by" language is ambiguous and must again be construed against CCRRG.

As noted in the Motion, A.R.S. §20-1123 does not permit after loss annulments of coverage which is exactly what CCRRG has done here.  *See Am. Cont'l Ins. Co. v. Steen,* 151 Wn.2d 512, 91 P.3d 864 (2004). *See also, Chandler v. Valentine*, 330 P.3d 1209 (Okla. 2014)(post loss policy cancellation that negates coverage barred by annulment statute); *Dairyland Ins. Co. v. Kankleberg,* 368 F. Supp. 996 (D. Ore. 1973)(same); *Loxley v. Pearson,* 2004 Ohio 3771, 2004 Ohio App. LEXIS 3389 (Ohio App. 2004)(same).

Further, even absent an annulment statute the right to cancel a liability insurance policy is not unlimited and it is against public policy to allow cancellation after loss that would nullify coverage for third party tort victims.  *Loxley* at *21-25; *See also Cosmopolitan Mut. Ins. Co. v. Lumbermen's Mut. Ins. Co.,* 281 N.Y.S. 2d 993, 228 N.E.2d 893 (1967)(retroactive cancellation of binder ineffective after date of accident); *Auto-Owners Ins. Co. v. Bruns,* 1979 Ohio App. 10902 * 8 (It is well settled that a policy of insurance may be cancelled at any time <u>before loss</u> by an agreement between the parties); *Couch on Insurance 3d* §31.47 (June 2018 Update)(parties may cancel insurance contract by agreement "provided the rights of third parties are not injured thereby"). *See also, Couch 3d* at §31.36 (June 2018 Update) ("[C]ancellation by insured is ineffective to relieve insurer from liability for accidents occurring before cancellation occurred."). *See also, Washington v. Savoie,* 634 So. 2d 1176, 1180 (La. 1994)(public policy precludes after loss agreements that negate coverage because they "would encourage bad faith 'cooperation' between an insurer who seeks to avoid payment of claims and a named insured whose premiums are fixed on the basis of loss experience.").

**Conclusion**

For all of the reasons set forth in the Motion and above, Plaintiffs request that the Court grant summary judgment in their favor on the garnishment action.

- 11 -

Dated this 6th day of May 2019

THE GUY LAW FIRM, LLP

*/s/ Steven S. Guy*
Steven S. Guy, Esq.
10105 E. Via Linda, Ste. 103
Scottsdale, AZ 85260
(480) 767-3175

**CERTIFICATE OF SERVICE**

I hereby certify that on this 6th day of May 2019, I electronically transmitted the foregoing document to the Clerk's Office using the CM/ECF System for filing and transmitted a Notice of Electronic Filing to the CM/ECF registrants.

H. Michael Wright, Esq.
Lincoln M. Wright, Esq.
**Udall │ Shumway**
1138 N. Alma School Rd., Suite 101
Mesa, AZ 85201
*Attorneys for Plaintiffs*

Steven G. Mesaros, Esq.
Kelly A. Hedberg, Esq.
**Renaud Cook Drury Mesaros, PA**
One North Central, Suite 900
Phoenix, AZ 85004-4417
*Attorneys for Garnishee Continuing Care Risk Retention Group, Inc.*

*/s/ Steven S. Guy*