**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Jacob Benson, et al., | No. CV-18-00006-PHX-DWL |
| Plaintiffs, | **ORDER** |
| v. | |
| Casa De Capri Enterprises LLC, et al., | |
| Defendants. | |

## INTRODUCTION

Jacob Benson is a disabled vulnerable adult who received skilled nursing care at a now-defunct facility called Casa de Capri Enterprises LLC ("Capri"). In December 2012, Benson and other family members (together, "Plaintiffs") brought a negligence action against Capri in Arizona state court.

At the time, Capri had a "claims paid" insurance policy issued by Defendant Continuing Care Risk Retention Group, Inc. ("CCRRG"). Under this unusual type of policy, the insurer is only responsible for indemnifying the insured against claims that become payable while the policy remains in effect. In contrast, under an "occurrence" policy or a "claims made" policy (which are more common), the insurer becomes responsible for indemnification so long as the liability-generating event occurred (or was disclosed to the insurer) during the policy term.

CCRRG initially assumed the defense of Plaintiffs' lawsuit against Capri pursuant to Capri's insurance policy. However, after Capri became insolvent, stopped paying its

premiums, declared bankruptcy, and cancelled the policy, CCRRG withdrew the defense. Years later, after the bankruptcy stay was lifted, Plaintiffs obtained a $1.5 million judgment against Capri and then initiated this garnishment action against CCRRG.

Plaintiffs' theory is that because Capri's policy with CCRRG provided $1 million in coverage for the underlying claim, and thus CCRRG is effectively holding $1 million that belongs to Capri, Plaintiffs may rely on the law of garnishment to obtain that money from CCRRG. CCRRG's defense, meanwhile, is that the underlying judgment against Capri is not covered because it was not issued until years after the policy was cancelled and Capri ceased being a CCRRG member (which, under this "claims paid" policy, means there is no coverage). Plaintiffs challenge this defense on a number of grounds, including that (1) the policy included a so-called "Bankruptcy Clause" that should be construed as requiring coverage when the insured's reason for cancelling the policy is bankruptcy or financial insolvency; and (2) regardless of the Bankruptcy Clause's applicability, disallowing coverage under these circumstances—where the liability-generating incident occurred while the policy remained in effect and the insured cancelled the policy only because it could not afford the premiums—would be inequitable and violate Arizona's statutory law and public policy. And one of CCRRG's rejoinders to those arguments is that because it is a unique form of insurance company known as a risk retention group ("RRG"), the preemption provisions of a federal statute—the Liability Risk Retention Act of 1986 ("LRRA")—preclude Plaintiffs from relying on Arizona law in an attempt to invalidate any of the policy's limitations on coverage.

As this summary makes clear (and is discussed in more detail below), this case presents unusually complicated insurance coverage issues. The resolution of those issues is further complicated by the dearth of judicial decisions, from any jurisdiction, analyzing "claims paid" insurance policies. The parties have now presented their positions via cross-motions for summary judgment. (Docs. 55, 125.) For the following reasons, Plaintiffs' motion is denied and CCRRG's motion is granted.

…

**BACKGROUND**

I.     <u>Facts</u>

        The facts summarized below, and detailed throughout this order, are taken from the parties' summary judgment submissions and other documents in the record.  The facts are uncontroverted unless otherwise noted.

        On December 10, 2012, Plaintiffs filed suit in Maricopa County Superior Court against Capri, alleging abuse and neglect of a vulnerable adult and negligence.  (Doc. 65 ¶ 1.)  At the time the lawsuit was served, Capri was insured under a "professional liability insurance policy" issued by CCRRG.  (Doc. 65 ¶ 3.)  The policy (the "2012 Policy") provided coverage from January 1, 2012 to January 1, 2013 and had a policy limit of $1 million.  (Doc. 56-1 at 36.)  Capri renewed its policy with CCRRG the following year (the "2013 Policy").  (Doc. 65 ¶ 4.)  The 2013 Policy provided coverage from January 1, 2013 to January 1, 2014.  (Doc. 13-1 at 5.)   Both policies incorporate by reference a 2009 subscription agreement (Doc. 13-1 at 53-73) and CCRRG's member bylaws (Doc. 65-4).  (Doc. 13-1 at 6 [2013 Policy]; Doc. 56-1 at 37 [2012 Policy].)

        The 2012 and 2013 Policies are "claims paid" policies.  (Doc. 132 ¶ 1.)  In the "Coverages" section of each policy, under the subheading "Insuring Agreement," CCRRG agreed to pay "amounts within the policy limits for 'Damages' . . . on behalf of a 'Member' *who becomes legally obligated to 'Pay' 'Damages' during the time they are a CCRRG 'Member.'*"  (Doc. 13-1 at 13, emphasis added.)  In the subscription agreement, CCRRG elaborated that "[t]he terms and conditions of this type of coverage differ significantly from a typical occurrence or claims made indemnification insurance policy.  In essence, . . . CCRRG has no responsibility for any portion of a claim not actually paid during the contract period.  Under the Claims Paid policy losses are only covered by the Company if the insured is a Member of CCRRG when the payment is made . . . ."  (*Id.* at 58.)

        On its website and in a brochure, CCRRG further clarified that "[t]he average carrier collects higher premiums to protect itself in advance from the possibility you will change carriers, because their obligation to pay claims persist even after you leave.  With

[CCRRG], your claims are paid for by the group as long as you are a member.  If you have an open claim and decide to leave [CCRRG], the group stops supporting the claim so your claim moves with you."  (Doc. 132 ¶ 16.)  Similarly, in a checklist concerning the renewal of coverage, CCRRG explained: "The result of [a 'claims paid' policy] is that Members pay less on average from year to year.  In return for typically lower premium costs, the Member agrees either to remain with CCRRG until any pending claim is resolved or has the option to purchase an extended reporting period (ERP) coverage when they leave CCRRG.  If a Member leaves CCRRG with an open claim and does not purchase ERP then the departing member is thus making the election to take the claim with them and handle defense and payment of indemnity out of their 'own pocket.'"  (Doc. 65-2.)

Before the 2013 renewal, CCRRG offered Capri two renewal options: (1) to continue with the existing "claims paid" policy for $256,169.32; or (2) to switch to a "claims made" policy for $292,345.45.  (Doc. 132 ¶ 17.)  Capri chose the less expensive "claims paid" option.  (*Id.*)

At the time the policies were issued, CCRRG was domiciled in South Carolina.  (Doc. 132 ¶ 7.)  The South Carolina Department of Insurance approved the CCRRG "claims paid" policy form.  (*Id.* ¶ 8.)  Gregory Anderson served as Capri's President and CEO from 2008 through September 2013, when it ceased ongoing operations. (Doc. 56-9 ¶¶ 5, 15.)  Before 2008, William Fay was Capri's "managing member." (Doc. 132-2 ¶¶ 1-5.)  Other relevant entities and individuals include Magnolia LTC Management Services ("Magnolia"), which served as the program manager for CCRRG, and Robert "Bob" Bates, who was Magnolia's president and CCRRG's corporate secretary.  (Doc. 65 ¶ 13.)

On December 28, 2012, Capri was served in the Arizona state court lawsuit.  (Doc. 65 ¶ 2.)  Capri timely reported the lawsuit to CCRRG, as it was required to do under the 2012 Policy.  (*Id.* ¶ 20.)  CCRRG accepted Capri's tender under the 2012 Policy and appointed defense counsel to defend the lawsuit without a written reservation of rights. (*Id.* ¶¶ 21, 23.)

On an unspecified date after CCRRG began providing a defense of the lawsuit,

Capri defaulted on its obligation to pay certain deductibles.  (*Id.* ¶ 24.)  As a result, Magnolia, through Bates, sent Capri a letter on July 15, 2013 informing Capri of its "seriously delinquent" status "in meeting its insurance deductible payment obligations." (Doc. 56-6 at 1-2.)  The letter stated that CCRRG's board of directors could terminate Capri's membership for the outstanding delinquencies and, if they did, "Capri's right to continued coverage of existing open claims . . . may be at risk if the outstanding default in payment is not cured to the satisfaction of the [board]."  (*Id.* at 1.)

On July 19, 2013, CCRRG and Capri agreed to a payment plan concerning the outstanding deductible obligation.  (Doc. 65 ¶ 25.)  However, less than one month into that plan, Capri again defaulted.  (*Id.*)  As a result, CCRRG again threatened action against Capri.  (*Id.*)

On August 13, 2013, CCRRG issued a notice of intent to cancel the 2013 Policy, which stated that the Policy would be cancelled if Capri did not pay $22,270.03 by August 27, 2013.  (Doc. 56-8 at 1; Doc. 65 ¶ 26.)

On August 19, 2013, Capri filed for bankruptcy.  (Doc. 65 ¶ 27.)  Afterward, Plaintiffs' lawsuit against Capri was stayed.  (Doc. 1-1 at 54-55, 58-59, 62.)

By August 22, 2013, CCRRG received notice of the bankruptcy.  (Doc. 65 ¶ 33.) That same day, the bankruptcy court authorized a debtor in possession loan for Capri "to immediately pay the . . . monthly premium for liability insurance of approximately $30,000."  (Doc. 65-13 at 3 ¶ 7.)

On September 6, 2013, CCRRG rescinded its previously issued notice of intent to cancel.  (Doc. 64 ¶ 35; Doc. 56-13.)

On September 20, 2013, the bankruptcy court approved the sale of Capri's assets to an unrelated party.  (Doc. 65 ¶ 36.)

On September 25, 2013, Capri stopped payment on a pair of premium checks it had previously sent to CCRRG, which CCRRG had not yet deposited in light of the bankruptcy proceeding.  (Doc. 65 ¶ 37.)  The parties dispute why Capri made this stop-payment decision—CCRRG contends that Capri "made a business decision to stop paying its

insurance premiums" while Plaintiffs contend that "[t]here was no 'business judgment' exercised regarding CCRRG and the stop payment . . . was a sham instigated by CCRRG to make it appear that the Policy had been cancelled before Capri's bankruptcy." (Doc. 132 ¶¶ 4, 21.)

On October 18, 2013, Capri's agent sent an email to CCRRG requesting the cancellation of the 2013 Policy "effective 8/1/13." (Doc. 56-14 at 1-2.) The parties dispute why Capri made this request—CCRRG characterizes it as another business decision made by Capri while Plaintiffs characterize it as a "manipulation[]" intended to "make it appear that Capri had voluntarily canceled the 2013 Policy retroactively to August 1, 2013," when in fact "Capri's cancellation of the 2013 Policy was solely due to its financial insolvency and bankruptcy." (Doc. 132 ¶¶ 1, 4, 22.)[1]

Capri had the option to purchase an "Extended Reporting Period" upon cancellation of the 2013 Policy, which would have had the effect of maintaining indemnity coverage for existing claims that had not yet been paid. (Doc. 132 ¶ 24.) The premium for the Extended Reporting Period would have been "300% of the premium charged for the annualized 2013 Policy, or approximately $599,328.90." (*Id.* ¶ 26.) Capri declined to purchase the Extended Reporting Period, and the parties dispute Capri's reasons for doing so—CCRRG contends that "Capri did not seek approval from the bankruptcy court to purchase the Extended Reporting Endorsement, presumably because to have done so would have been to use the limited assets of the bankruptcy estate to improperly transform [Plaintiffs'] Claim against Capri from an unsecured claim to a priority claim in Capri's bankruptcy, to the detriment of other creditors" (Doc. 125 at 9 n.9), while Plaintiffs contend that "any such 'option' to purchase an Extended Reporting period was theoretical only. By

---

[1]     CCRRG did not accept the initial cancellation request because one of the reasons for the request ("Facility Sold") that Capri provided in an accompanying form was inaccurate. (Doc. 56-14 at 1 ["Unfortunately, I cannot accept the Loss Policy Release as it stands. The signature dates reference 08/01/2013 and the reason for cancellation references both Requested by the Insured and Facility Sold. To the best of our knowledge the facility did not sell until sometime in October."].) In response, Capri's agent initially wrote: "What do you . . . want as the reason?" (*Id.*) On October 22, 2013, Capri's agent submitted a revised cancellation request, again to be "effective 8/1/13," which identified the sole reason for the cancellation request as "requested by insured." (Doc. 56-15.)

the time CCRRG manipulated Capri into the sham backdated cancellation request, Capri was heavily in debt to CCRRG, had been insolvent for quite some time, had ceased operations, had filed bankruptcy, [and] had sold and liquidated its assets.  Under those circumstances, Capri was incapable of purchasing an Extended Reporting Period or otherwise continuing coverage."  (Doc. 132 ¶ 24.)

On November 19, 2013, CCRRG (via Magnolia) sent a letter to Capri confirming that the 2013 Policy had been terminated as of August 1, 2013.  (Doc. 65-19.)  This letter further provided as follows:

> Because Capri elected to stop payment on the August and September of 2013 premium payments and retroactively cancel its CCRRG membership effective August 1, 2013, its rights as a "member" under the policy and subscription agreement ceased as of that date. At that time of cancellation, there was no legal obligation to pay any indemnity with respect to [Plaintiffs'] claim, so CCRRG has no further obligation to pay any indemnity, whether in the form of a settlement, a judgment against Capri, or otherwise.

(*Id.* at 2.)

On August 14, 2014, defense counsel withdrew from representing Capri in Plaintiffs' lawsuit.  (Doc. 65 ¶ 47.)

On October 1, 2014, CCRRG (via Magnolia) informed Plaintiffs' counsel that CCRRG's insurance coverage for the claims in Plaintiffs' lawsuit "ceased" when Capri was no longer a member and the "policy was no longer in force."  (Doc. 65 ¶ 46 [undisputed that the email was sent].)

In March 2015, Plaintiffs tendered a policy limits settlement demand to CCRRG, which was rejected.  (Doc. 65 ¶¶ 48-49.)  Plaintiffs then sought and obtained relief from the bankruptcy stay "in order to proceed to judgment against Capri," and the resulting order "stated that Plaintiffs could not seek to enforce any judgment against the bankruptcy estate."  (Doc. 65 ¶ 49.)

Plaintiffs ultimately prevailed in their lawsuit against Capri.  (Doc. 65 ¶ 50.)  On November 29, 2017, the superior court entered a final judgment in Plaintiffs' favor in the amount of $1,501,069.90.  (*Id.*)

On December 18, 2017, Plaintiffs sought a writ of garnishment against CCRRG. (Doc. 1-2 at 233-35.)  In their application for the writ, Plaintiffs asserted that "[CCRRG] owes [Capri] money which was not earned by [Capri] for personal services" and "[CCRRG] is holding money for [Capri] which is not exempt from collection." (*Id.* at 234-35.)  CCRRG answered that "[it] was not holding personal property or money belonging to [Capri]." (Doc. 29 at 3.)

II.   Relevant Procedural History

On January 2, 2018, CCRRG removed the garnishment action to federal court. (Doc. 1.)

On January 9, 2018, CCRRG moved to dismiss, or, alternatively, to stay litigation and compel arbitration.  (Doc. 13.)  On August 17, 2018, Judge Logan issued an order denying CCRRG's motion.[2]  (Doc. 27.)

On March 2, 2019, Plaintiffs moved for summary judgment.  (Doc. 55.)  That motion is fully briefed.  (Docs. 56, 64, 65, 68.)

On April 18, 2019, CCRRG filed a renewed motion to compel arbitration.  (Doc. 63.)

On July 30, 2019, the Court granted CCRRG's renewed motion to compel arbitration, denied Plaintiffs' motion for summary judgment as moot, and dismissed the case without prejudice.  (Doc. 88.)

Plaintiffs appealed the order compelling arbitration.  (Doc. 93.)  In November 2020, after full briefing and oral argument, the Ninth Circuit certified a question of law to the Arizona Supreme Court.  *Benson v. Casa de Capri Enters., LLC*, 980 F.3d 1328 (9th Cir. 2020).

In January 2022, the Arizona Supreme Court resolved that question in Plaintiffs' favor, holding that "the doctrine of direct benefits estoppel can[not] be applied in an Arizona garnishment proceeding." *Benson v. Casa de Capri Enters., LLC*, 502 P.3d 461,

---

[2]   This case was originally assigned to Judge Logan and was transferred to the undersigned on October 31, 2018.  (Doc. 35.)

465 (Ariz. 2022).  Based on this ruling, the Ninth Circuit issued an amended memorandum decision in March 2022 concluding that "the district court erred in granting CCRRG's motion to compel arbitration under the doctrine of direct benefits estoppel."  *Benson v. Casa de Capri Enters., LLC*, 2022 WL 822126, *1 (9th Cir. 2022).  In a footnote, the Ninth Circuit added: "CCRRG alternatively argues that the [LRRA] preempts state law governing the operation of risk retention groups, and apparently by extension precludes Arizona from limiting arbitration provisions in insurance policies provided by a risk retention group.  The district court did not address this argument and [Plaintiffs] argue that CCRRG did not adequately raise it below.  We leave these matters to the district court in the first instance."  *Id.* at *2 n.1.

On June 7, 2022, after reviewing post-remand briefing from the parties (Docs. 112, 113), the Court permitted CCRRG to file its own motion for summary judgment.  (Doc. 115.)  The parties also filed a joint request to further brief the LRRA preemption issue on an accelerated basis (Doc. 117), which the Court granted (Doc. 118).  The parties then filed additional briefs on LRRA preemption.  (Docs. 119, 120, 123.)

On July 21, 2022, CCRRG filed its motion for summary judgment (Doc. 125), which is fully briefed.  (Docs. 126, 131-37.)

On November 4, 2022, the Court denied CCRRG's renewed motion to compel arbitration based on LRRA preemption.  (Doc. 138.)

On November 22, 2022, CCRRG appealed the Court's denial of the renewed motion to compel arbitration.  (Doc. 139.)

On December 15, 2022, CCRRG filed a motion to stay proceedings pending its appeal of the November 4, 2022 order denying arbitration.  (Doc. 141.)

On January 9, 2023, after the motion to stay became fully briefed (Docs. 142, 143), the Court issued an order denying the stay request.  (Doc. 144.)

On January 12, 2023, the Court issued a tentative ruling addressing the cross-motions for summary judgment.  (Doc. 146.)

On January 24, 2023, the Court heard oral argument.  (Doc. 147.)

**LEGAL STANDARD**

"The court shall grant summary judgment if [a] movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A fact is 'material' only if it might affect the outcome of the case, and a dispute is 'genuine' only if a reasonable trier of fact could resolve the issue in the non-movant's favor."  *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125 (9th Cir. 2014).  The court "must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inference[s] in the nonmoving party's favor."  *Rookaird v. BNSF Ry. Co.*, 908 F.3d 451, 459 (9th Cir. 2018).  "Summary judgment is improper where divergent ultimate inferences may reasonably be drawn from the undisputed facts."  *Fresno Motors*, 771 F.3d at 1125.

A party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  "In order to carry its burden of production, the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial."  *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000).  "If . . . [the] moving party carries its burden of production, the nonmoving party must produce evidence to support its claim or defense."  *Id.* at 1103.

"If the nonmoving party fails to produce enough evidence to create a genuine issue of material fact, the moving party wins the motion for summary judgment."  *Id.*  There is no issue for trial unless enough evidence favors the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  "If the evidence is merely colorable or is not significantly probative, summary judgment may be granted."  *Id.* at 249-50.  At the same time, the evidence of the non-movant is "to be believed, and all justifiable inferences are

to be drawn in his favor." *Id.* at 255. "[I]n ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden." *Id.* at 254. Thus, "the trial judge's summary judgment inquiry as to whether a genuine issue exists will be whether the evidence presented is such that a jury applying that evidentiary standard could reasonably find for either the plaintiff or the defendant." *Id.* at 255.

"[W]hen parties submit cross-motions for summary judgment, [e]ach motion must be considered on its own merits," but the Court must consider all evidence submitted in support of both cross-motions when separately reviewing the merits of each motion. *Fair Hous. Council of Riverside Cty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001) (quotation marks omitted). For "the party with the burden of persuasion at trial"—usually the plaintiff—to succeed in obtaining summary judgment in its favor, it "must establish beyond controversy every essential element" of each claim on which summary judgment is sought. *S. California Gas Co. v. City of Santa Ana*, 336 F.3d 885, 888 (9th Cir. 2003). The party without the burden of persuasion at trial—usually the defendant—is entitled to summary judgment where it establishes that the party with the burden of persuasion will be unable to prove at least one element of its claim in light of the undisputed facts. *Celotex Corp.*, 477 U.S. at 322-23. This distinction reflects that the burden is ultimately on the proponent of each claim to prove it. *Id.* ("Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.").

…

…

…

**DISCUSSION**

I.   Garnishment Overview

"In attempting to collect a judgment against the insured, Arizona law permits a non-signatory judgment creditor to use garnishment to litigate an insurer's obligations to the judgment debtor under an insurance policy." *Benson*, 980 F.3d at 1331 (citing *Sandoval v. Chenoweth*, 428 P.2d 98 (Ariz. 1967)). Accordingly, the question in this action is whether CCRRG owes any money to Capri (the judgment debtor) pursuant to the Capri/CCRRG insurance policy—if so, Plaintiffs (the judgment creditors) may rely on the law of garnishment to recover those funds. *See also* A.R.S. § 12-1584(B).

II.   Applicable Law

Plaintiffs rely on Arizona law in support of their summary judgment arguments. (Docs. 55, 131.) Meanwhile, although "CCRRG does not concede that Arizona law applies to this case" (Doc. 124 at 4 n.4) and argues that, due to LRRA preemption, "Arizona law cannot be used to regulate the substantive terms of the CCRRG Claims Paid Policy" (Doc. 64 at 7), "CCRRG [also] finds no conflict between Arizona and South Carolina law on contract interpretation" and thus "cites to Arizona law." (Doc. 124 at 4 & n.4.) Thus, at least with respect to the law generally governing contract interpretation, the parties appear to agree that the Court should apply Arizona law.

Under Arizona law, "[t]he interpretation of an insurance contract is a question of law." *Sparks v. Republic Nat'l Life Ins. Co.*, 647 P.2d 1127, 1132 (Ariz. 1982). "[W]here the provisions of the contract are plain and unambiguous upon their face, they must be applied as written, and the court will not pervert or do violence to the language used, or expand it [beyond] its plain and ordinary meaning or add something to the contract which the parties have not put there." *D.M.A.F.B. Fed. Credit Union v. Emps. Mut. Liab. Ins. Co. of Wis.*, 396 P.2d 20, 23 (Ariz. 1964). "To determine the plain meaning of a term," Arizona courts "refer to established and widely used dictionaries." *W. Corr. Grp., Inc. v. Tierney*, 96 P.3d 1070, 1074 (Ariz. Ct. App. 2004) (citation omitted).

An insurance policy "must be read as a whole, so as to give a reasonable and

harmonious effect to all of its provisions." *Charbonneau v. Blue Cross*, 634 P.2d 972, 975 (Ariz. Ct. App. 2007).  Further, "[i]n the insurer/insured context . . . Arizona's public policy protects insureds.  Hence Arizona law requires that undefined terms be given the meaning used by laypeople in everyday usage and that terms and provisions that remain ambiguous after all relevant considerations be interpreted in favor of coverage and against the insurer." *Equity Income Partners, LP v. Chi. Title Ins. Co.*, 387 P.3d 1263, 1268 (Ariz. 2017).

"If a policy is subject to 'conflicting reasonable interpretations,' it is ambiguous." *Teufel v. Am. Fam. Mut. Ins. Co.*, 419 P.3d 546, 548 (Ariz. 2018) (citation omitted).  However, "[a] contract is not ambiguous just because the parties to it or, as here, a party to it and the other party's successor, disagree about its meaning.  Language in a contract is ambiguous only when it can reasonably be construed to have more than one meaning." *In re Estate of Lamparella*, 109 P.3d 959, 963 (Ariz. Ct. App. 2005).  "In determining whether an ambiguity exists in a[n insurance] policy, the language should be examined from the viewpoint of one not trained in law or in the insurance business." *Sparks*, 647 P.2d at 1132.  If the policy term is still ambiguous after considering the term's plain and ordinary meaning, Arizona courts consider "legislative goals, social policy, and the transaction as a whole." *First Am. Title Ins. Co. v. Action Acquisitions, LLC*, 187 P.3d 1107, 1110 (Ariz. 2008).  If these interpretive guides fail to "elucidate a clause's meaning," a court should construe the clause against the insurer.  *Id.*

"Generally, the insured bears the burden to establish coverage under an insuring clause, and the insurer bears the burden to establish the applicability of any exclusion." *Keggi v. Northbrook Prop. & Cas. Ins. Co.*, 13 P.3d 785, 788 (Ariz. Ct. App. 2000).

III.    Merits

The parties' cross-motion briefing raises an array of complicated arguments that sometimes overlap.  Accordingly, the Court will begin by providing a brief overview of the parties' positions.

CCRRG's overarching argument is that the type of insurance policy at issue in this case, a "claims paid" policy, is very different from other types of more common insurance

policies (such as an "occurrence" policy or a "claims made" policy) in that it only "covers the insured's legal obligations to pay . . . damages or defense costs <u>during membership</u>," such that "[i]f a member ceases to maintain membership for any reason, the member/insured takes pending claims with it, unless, per the insurance contract's terms, it chooses to purchase an Extended Reporting Period." (Doc. 64 at 8-9.) (*See also* Doc. 125 at 7 ["The Plain, Unambiguous Language Of the Claims Paid Policy Only Provides Coverage During Membership . . . ."].) According to CCRRG, because Capri cancelled its policy in mid-2013 and Plaintiffs did not obtain their judgment against Capri until 2017, it follows there is no coverage. (Doc. 64 at 9-10.) CCRRG also contends that, to the extent Plaintiffs seek to argue this outcome is unlawful under Arizona law, such arguments are preempted by the LRRA. (*See, e.g.*, Doc. 125 at 12-14.)

Plaintiffs disagree and argue that their claim against Capri should be deemed covered by the 2012 Policy.[3] First, Plaintiffs point to the Bankruptcy Clause in the Policy, which provides that the "[b]ankruptcy or insolvency of the 'Member' . . . will neither expand our [CCRRG's] obligation nor relieve us [CCRRG] of our obligations under this 'Claims Paid' policy." (Doc. 56-1 at 20.) Plaintiffs urge the Court to interpret this clause as "preclud[ing] a forfeiture of coverage for existing claims" when "the insured is incapable of continuing its membership due to insolvency or bankruptcy" and thus to "find that a termination of membership in the risk retention group may preclude coverage for an existing claim *only where the membership termination was not caused by the insured's insolvency or bankruptcy*." (Doc. 55 at 4-11.) Alternatively, Plaintiffs argue that various provisions of Arizona law would preclude CCRRG from denying coverage under these

---

[3]    In the tentative ruling issued before oral argument, the Court stated that it perceived Plaintiffs' coverage claim as based on both the 2012 and 2013 Policies. (Doc. 146 at 15.) During oral argument, Plaintiffs' counsel clarified that the claim is only based on the 2012 Policy: "[T]he policy that was triggered here was the 2012 Policy. The claim was made during the 2012 Policy, was reported within the grace period of the 2012 Policy, and that's the only Policy that was triggered. There is a 2013 renewal policy, of course, and the Court is aware that the terms of it are the same. But for purposes of claims made coverage, the policy that responds is the policy that's [in] effect at the time . . . the claim is first made. That's the 2012 Policy." Later, Plaintiffs' counsel stated "Correct" when asked to confirm that "the only Policy that's relevant here is the 2012 Policy, at least for purposes of coverage."

circumstances. Those provisions are (1) Arizona's anti-annulment statute, A.R.S. § 20-1123 (Doc. 55 at 11-13), which Plaintiffs contend was incorporated into the policies via a "Conformity To Statute" clause; (2) Arizona's rule that an insurer may only deny coverage based on the breach of a policy condition if the breach was substantially prejudicial to the insurer (*id.* at 13-14); and (3) Arizona's public policy favoring freedom of contract, which is implicated because CCRRG's "claims paid" policies have the practical effect of "compel[ling] an insured to renew and continue coverage with CCRRG for as long as any claim remains unresolved" (*id.* at 14-16).[4]

…

---

[4]       Plaintiffs have repeatedly suggested that their sole theory of recovery in this action is that CCRRG violated its duty to *indemnify* Capri for covered losses. (*See, e.g.*, Doc. 31 at 2 [Plaintiffs' explanation, in the Rule 26(f) report, that "the primary issues presented in this case are whether there is coverage under the professional liability policy CCRRG issued to Capri and in effect at the time plaintiffs' underlying claim was first made and, if so, whether CCRRG is liable for the full amount of the judgment"]; Doc. 40 at 2 ["Plaintiffs' garnishment remains a proper action for the determination of CCRRG's insurance coverage for the underlying state court judgment."]; *id.* at 4-5 ["Arizona courts have long considered garnishment to be a proper civil action for a judgment creditor to determine insurance coverage under an insurance policy issued to the judgment debtor. Further, under well-established Ninth Circuit law, a garnishee's removal of a state court issued writ of garnishment does not negate the judgment creditor's right to determine coverage in such proceeding." (internal citations omitted)]; *id.* at 10 ["Plaintiffs . . . allege[] in its garnishment action that CCRRG owes a debt (e.g. insurance coverage) to Capri."]; Doc. 55 at 2 [Plaintiffs' summary judgment motion: "This Motion addresses only the purely legal issues of whether under Arizona's rules of insurance policy construction and applicable public policy considerations, the CCRRG policy provides coverage for the judgment up to the $1,000,000 policy limit."].) However, during oral argument, Plaintiffs' counsel stated that Plaintiffs also seek to recover under the theory that CCRRG breached its duty to *defend* Capri in the underlying lawsuit: "I admit the focus has been on the indemnification . . . [but] we've always maintained that they violated both the duty to defend and the duty to indemnify." It is not clear to the Court that Plaintiffs have, in fact, properly pleaded and disclosed an intention to pursue recovery under a breach-of-the-duty-to-defend theory (as opposed to simply making references to the duty to defend as part of their breach-of-the-duty-to-indemnify theory). Indeed, during the early stages of the case, Plaintiffs voiced an intention to amend their operative pleading, which they characterized as only seeking a "determination of CCRRG's insurance coverage for the underlying state court judgment," to add a claim related to CCRRG's alleged breach of its duty to defend Capri. (Doc. 40 at 1-2, 10; Doc. 40-1 at 9-10 [proposed new Count Three, alleging that CCRRG engaged in insurance bad faith by, *inter alia*, withdrawing its defense of Capri].) However, Plaintiffs later withdrew that request and agreed to stand on their original pleading. (Doc. 80.) This suggests that no such claim was ever added. Nevertheless, because the issue has not been fully briefed, the Court reserves judgment as to whether Plaintiffs may separately pursue relief under a breach-of-the-duty-to-defend theory. As discussed at the conclusion of this order, the parties may file supplemental briefing on that topic. This order is limited to resolving the parties' cross-motions for summary judgment as to Plaintiffs' claim for garnishment under a breach-of-the-duty-to-indemnify theory.

A.     **The Bankruptcy Clause**

It is undisputed that Capri did not become legally obligated to pay damages to Plaintiffs until December 2017.  (Doc. 65 ¶ 50; Doc. 132 ¶ 31 [not disputing this fact in relevant part].)  CCRRG argues that because Capri was no longer a member at that time, having cancelled the 2013 Policy in mid-2013, it follows that coverage is unavailable.  (Doc. 64 at 5, 8-11; Doc. 125 at 7-9.)  In support of this contention, CCRRG points to the insuring agreement in each policy, which provides that CCRRG will only pay "amounts within policy limits for 'Damages' . . . on behalf of a member who becomes legally obligated to 'Pay' 'Damages' . . . during the time they are a CCRRG 'Member.'"  (Doc. 13-1 at 13.)  CCRRG also points to the subscription agreement, which elaborates that "[t]he terms and conditions of this type of coverage differ significantly from a typical occurrence or claims made indemnification insurance policy.  In essence, . . . CCRRG has no responsibility for any portion of a claim not actually paid during the contract period.  Under the Claims Paid policy losses are only covered by the Company if the insured is a Member of CCRRG when the payment is made . . . ."  (*Id.* at 58.)

Plaintiffs contend this analysis is too facile because it overlooks why Capri cancelled the 2013 Policy and ceased being a member—specifically, Capri's insolvency and bankruptcy, which interfered with Capri's ability to continue paying the premiums necessary to maintain the policy and membership.  According to Plaintiffs, this possibility was anticipated by the Bankruptcy Clause, which provides that "[b]ankruptcy or insolvency of the 'Member' . . . will neither expand our obligation nor relieve us of our obligations under this 'Claims Paid' Policy."  (Doc. 13-1 at 32; Doc. 56-1 at 20.)  Plaintiffs argue that because "it is undisputed that the cancellation of the 2013 Policy was due solely to Capri's insolvency and bankruptcy," "under the plain meaning of the Bankruptcy Clause Capri's post-bankruptcy induced cancellation of the 2013 Policy cannot serve to 'relieve' CCRRG of its 'obligations,' including its obligation to defend and indemnify its insolvent and bankrupt insured."  (Doc. 55 at 4-7.)  At a minimum, Plaintiffs argue the policy is ambiguous because there is a conflict between the Bankruptcy Clause and the continuing

membership conditions (and such conflicts must be construed against the insurer and in favor of coverage).  (*Id.* at 7-9.)  In response and in its cross-motion, CCRRG argues that Plaintiffs' interpretation of the Bankruptcy Clause is flawed because it would "expand" CCRRG's obligations in the event of bankruptcy or insolvency, something the Clause expressly prohibits.  (Doc. 64 at 15-16; Doc. 125 at 14-17.)

CCRRG has the better of these arguments.  As an initial matter, Plaintiffs' clarification during oral argument that their coverage arguments are only based on the 2012 Policy is difficult to reconcile with Plaintiffs' reliance on the Bankruptcy Clause.  When it came time to renew the *2012* Policy, Capri was not bankrupt or insolvent.  To the contrary, Capri chose to use its money to purchase the 2013 Policy and maintain its membership. Although Plaintiffs argue in their summary judgment papers that Capri's bankruptcy was the reason why the *2013* Policy was later cancelled and Capri later ceased being a member, it is unclear why this matters if Plaintiffs' coverage theory (as clarified during oral argument) is tied to the 2012 Policy.

At any rate, Plaintiffs' position fails on the merits.  When interpreting the language in an insurance contract, courts must decide whether the language has a plain, ordinary, and unambiguous meaning.  *D.M.A.F.B. Fed. Credit Union*, 396 P.2d at 23.  When, as here, each side proffers a conflicting interpretation, the ambiguity analysis turns on whether each side's proffered interpretation is reasonable.  *Teufel,* 419 P.3d at 548; *In re Estate of Lamparella*, 109 P.3d at 963.

Plaintiffs' interpretation of the Bankruptcy Clause is unreasonable while CCRRG's interpretation is reasonable.  As noted, the Bankruptcy Clause provides that the insolvency or bankruptcy of a member will neither "expand" CCRRG's coverage obligations nor "relieve" CCRRG of its coverage obligations.  In their briefing, Plaintiffs focus almost exclusively on the word "relieve."  Not only are Plaintiffs wrong about the meaning of "relieve" in this context, for the reasons discussed in the paragraphs below, but Plaintiffs fail to explain how a ruling in their favor could be construed as something other than "expand[ing]" CCRRG's coverage obligations.  The 2012 and 2013 Policies, both of which

are expressly denominated as "Claims Paid" policies (Doc. 13-1 at 12), contain several provisions describing how "claims paid" coverage works, explaining how such coverage is different from typical "claims made" or "occurrence" coverage, and clarifying that losses are only covered if the insured remains a member of CCRRG at the time the payment obligation comes into effect.   (*Id.* at 13, 58.)   Those Policies also incorporate the Subscription Agreement, which explains in plain, non-legalese text that "CCRRG has no responsibility for any portion of a claim not actually paid during the contract period."  (*Id.* at 58.)  It is critical to take these provisions into account when construing the meaning of the terms "relieve" and "expand" in the Bankruptcy Clause—after all, "the policy must be read as a whole, so as to give a reasonable and harmonious effect to all of its provisions." *Charbonneau*, 634 P.2d at 975.  When all of these provisions are read as a whole, it becomes obvious that requiring CCRRG to provide coverage for a December 2017 judgment against an entity that cancelled its policy and ceased being a CCRRG member more than four years earlier would "expand" CCRRG's coverage obligations, which is an outcome the Bankruptcy Clause prohibits.[5]

In contrast, declining to find coverage in this circumstance would not "relieve" CCRRG of any coverage obligations.  On this point, both sides identify non-precedential cases in which courts attempted to discern the meaning of the word "relieve" in other insurance policies' bankruptcy clauses.  With the benefit of oral argument, the Court concludes that the parties' cited cases are of limited utility because they do not involve

---

[5]      During oral argument, Plaintiffs appeared to concede that their interpretation of the Bankruptcy Clause would, in fact, result in an expansion of CCRRG's coverage obligations.   Nevertheless, Plaintiffs argued that because CCRRG's competing interpretation would result in relieving CCRRG of its coverage obligations, the existence of this unavoidable "clash" created an ambiguity: "I understand completely the Court's position on the other part of the Bankruptcy Clause that says we're not going to expand the obligations.  But the fact of the matter is in the context of this case, those two separate . . . concepts directly clash in the context of this case."  Later, when the Court stated "I cannot in mind conjure a way that your position is correct without that being an expansion of coverage obligations," Plaintiffs' counsel did not deny this point and simply added "Which makes it ambiguous."   Accordingly, the Court takes it as undisputed that Plaintiffs' interpretation of the Bankruptcy Clause would "expand" CCRRG's coverage obligations. But even if the point weren't conceded, the Court would reach the same conclusion for the reasons set forth in the text above.

"claims paid" policies.  As noted, Capri's policies contained language expressly noting that "CCRRG has no responsibility for any portion of a claim not actually paid during the contract period" (Doc. 13-1 at 58), and this language must be read in conjunction with the Bankruptcy Clause when deciding what it means to "relieve" CCRRG of a coverage obligation.  *Charbonneau*, 634 P.2d at 975.  Because the parties' cited cases do not purport to decide what it means to "relieve" an insurer from such an obligation, they are only marginally helpful.

With those caveats in mind, the parties' cited cases (to the extent they provide any assistance here) tend to support CCRRG's position.  In *Rosciti v. Insurance Company of Pennsylvania*, 659 F.3d 92 (1st Cir. 2011), the plaintiffs—who had purchased a defective motor home from a manufacturer (Monaco) that subsequently went bankrupt—sued an insurance company (ICSOP) that had issued an excess coverage policy to Monaco.  *Id.* at 93-94.  There is no suggestion that the policy was a "claims paid" policy.  Although the policy contained a retained-limit provision that "ISCOP's duty to pay arose only after Monaco had paid the initial $500,000, which Monaco had not done," the policy also contained a bankruptcy clause providing that Monaco's "bankruptcy, insolvency or inability to pay . . . shall not relieve [ICSOP] from the payment of any claim covered by this Policy."  *Id.*  Like Plaintiffs here, the plaintiffs argued that because Monaco's insolvency was the reason why Monaco had been unable to make the initial $500,000 payment, it followed that there was "a clash between the Retained Limit Provision and the Bankruptcy Provision" that had to be resolved in their favor.  *Id.* at 96.  The First Circuit disagreed, holding that "[w]e see no inherent conflict between the Retained Limit Provision and the Bankruptcy Provision; rather, we agree with ICSOP that the latter is plainly subject to the limitations in the former. . . .  [W]e will give the Excess Policies their plain meaning: ICSCOP is still liable above the retained limit if Monaco is bankrupt, but only after Monaco exhausts the retained limit."  *Id.* at 97.

Here, too, declining to find coverage would not "relieve" CCRRG of any obligations because the 2012 and 2013 Policies do not create any obligation, in the first instance, to

provide coverage for a judgment entered against a former member following the expiration of the member's policy.[6]  This outcome may be harsh from an equitable and public policy perspective—a consideration addressed in other portions of *Rosciti* and discussed in further detail in later sections of this order—but it is compelled by the plain, unambiguous language of the policy itself and is a foreseeable outcome under a "claims paid" policy.

*Pinnacle Pines Community Association v. Everest National Insurance*, 2014 WL 1875166 (D. Ariz. 2014), which both sides cite in their motion papers, does not compel a different conclusion.  There, the plaintiffs—who obtained a $1.37 million judgment against a homebuilder (Empire) that subsequently went bankrupt—sued an insurance company (Everest) that had issued an excess coverage policy to Empire.  *Id.* at *1.  The policy appears to have been an "occurrence" policy, not a "claims paid" policy.  *Id.* ("The terms of the LWP state that it 'applies to 'bodily injury' and 'property damage' which is not included in the 'products-completed operations hazard' only if: (1) the 'bodily injury' or 'property damage' is caused by an 'occurrence' that takes place in the 'coverage territory'; and (2) the 'bodily injury' or 'property damage' occurs during the policy period.").  The policy contained a $250,000 self-insured retention, which was described as one of the "Conditions Precedent To Coverage," and also contained a "bankruptcy provision" providing that "[t]he bankruptcy or insolvency you or your estate will not relieve us of

---

[6]    The Court also notes that this interpretation of the Bankruptcy Clause would not transform the term "relieve" into surplusage.  *Cf. Awa v. Guam Mem'l Hosp. Auth.*, 726 F.2d 594, 597 (9th Cir. 1984) ("[S]tatutes should not be construed to make mere surplusage of any statutory provision."); *Planned Parenthood of Idaho, Inc. v. Wasden*, 376 F.3d 908, 928 (9th Cir. 2004) ("[I]t is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.") (citations and internal quotation marks omitted).  Had the underlying judgment in Plaintiffs' lawsuit against Capri been issued before the 2013 Policy was cancelled and Capri ceased being a member, and Capri went bankrupt or become insolvent afterward, the Bankruptcy Clause would ensure that CCRRG was not relieved of its obligation to provide coverage for the judgment.  *Rosciti*, 659 F.3d at 97 ("ISCOP is still liable above the retained limit if Monaco is bankrupt, but only after Monaco exhausts the retained limit.").  This possibility also undermines Plaintiffs' contention that the "only way" to "reconcile the Continuing Membership Conditions with the Bankruptcy Clause is to find that a termination of membership in the risk retention group may preclude coverage for an existing claim only where the membership termination was not caused by the insured's insolvency or bankruptcy." (Doc. 55 at 8, emphasis omitted.)

our obligations under this policy." *Id.* at *3-5.  Unlike here, the bankruptcy clause further provided that "[i]n the event there is insurance, whether or not applicable to [a claim] within the Retained Amount, you [Empire] will continue to be responsible for the full amount of the Retained Amount before the Limits of Insurance under the policy apply." *Id.* at *5. *Pinnacle Pines* is not helpful in resolving the dispute here because it involved a differently worded bankruptcy clause as well as a different type of insurance policy that did not (unlike the one here) contain other provisions expressly cautioning that the insurer had no responsibility for any portion of a claim not actually paid during the contract period.[7]

Finally, the Court is unpersuaded by Plaintiffs' contention, emphasized during oral argument, that it was incumbent upon CCRRG to provide a detailed explanation of the interplay between the Bankruptcy Clause and CCRRG's coverage obligations.[8]  Because the policy was not ambiguous for the reasons discussed above, no further explanation was necessary.  The mere fact that Plaintiffs have now advanced an interpretation that differs from CCRRG's does not mean there is an ambiguity.  *Estate of Lamparella*, 109 P.3d at 963 ("A contract is not ambiguous just because the parties to it or, as here, a party to it and the other party's successor, disagree about its meaning.  Language in a contract is

---

[7]     The other cases cited by Plaintiffs, including *Matter of Fed. Press Co., Inc.*, 104 B.R. 56 (Bankr. N.D. Ind. 1989), and *Sturgill v. Beach at Mason Ltd. P'ship*, 2015 WL 6163787 (S.D. Ohio 2015), are distinguishable for similar reasons.  It is also notable that, in *Sturgill* (which, like *Pinnacle Pines*, involved the interplay between a bankruptcy clause and a self-insured retention in an occurrence policy), the court rejected the insurer's reliance on *In re Kismet Prod., Inc.*, 2007 WL 6877250 (Bankr. N.D. Ohio 2007), on the ground that "*Kismet* is distinguishable in several important respects.  First, the policy in question [in *Kismet*] was a *reimbursement* policy, not a liability policy, whose whole purpose and structure was to provide a vehicle for reimbursing the employer for plan benefits it paid to participants in excess of their deductibles.  Where the employer had not actually paid the benefits, there was nothing to 'reimburse.'  Second, the bankruptcy clause in the policy specifically stated that any payments to the trustee or receiver would be made only if the employer had, in fact, paid the benefits to plan participants.  Finally, the policy also specifically defined the term 'paid' as it related to the plan benefits as payment by check or similar conveyance, which makes sense given the nature of the policy as a vehicle for reimbursement." *Id.* at *5.  CCRRG's "claims paid" policies more closely resemble the policy at issue in *Kismet* than the policies at issue in *Sturgill* and Plaintiffs' other cited cases.

[8]     More specifically, counsel argued: "CCRRG had the opportunity to make it not ambiguous.  They could have clearly expressed in their policy in any number of different ways . . . that if the insured's bankruptcy prevents it from continuing membership, you still don't have coverage.  They didn't do that.  But they surely knew that this was a possibility . . . .  They could have cured any ambiguity very easily . . . ."

ambiguous only when it can reasonably be construed to have more than one meaning.").

Plaintiffs' remaining arguments fare no better. Plaintiffs argue that the phrase "and become due and owing during membership" is ambiguous and must be construed against CCRRG. (Doc. 55 at 9-10.) But the plain and ordinary meaning of "due" and "owing" are clear. Due generally means "owed at present." *Due*, Dictionary.com, https://www.dictionary.com/browse/due. Owe means "under obligation to pay or repay." *Owe*, Dictionary.com, https://www.dictionary.com/browse/owe. The 2012 and 2013 Policies state on the first page, in bold and capitalized text, that CCRRG has an obligation to cover "Damages" that arise from claims that are both (1) made by a member within a policy period and (2) "become[] due and owing during membership." (Doc. 13-1 at 12; Doc. 56-1 at 1.) The 2017 judgment were not "due and owing" while the 2012 or 2013 Policies remained in effect and Capri remained a member.

Nor is there any merit to Plaintiffs' argument that the "nearly indistinguishable" definitions of "Claims Made" and "Claims Paid" are a reason to require coverage. (Doc. 55 at 10 n.3.) The terms are defined as follows:

> 5) "Claims-Made" means a "Claim" arising out of "Occurrence" "Medical Incident" or "Offense" after the "Retroactive Date" shown in the "Policy" declaration and **reported** during "Policy Period" or within thirty (30) days after the expiration of the "Policy Period" in effect when the "Claim" is first made.
>
> 6) "Claims-Paid"™ means a "Claim" arising out of an "Occurrence," "Medical Incident," or "Offense" after the "Retroactive Date" shown in the "Policy" declaration and reported during "Policy Period" including an purchased extended reporting periods **for which the company will "Pay" such amount within policy limits for**:
>
>> a) Fees charged by an attorney designated by us; and
>>
>> b) Other fees, costs and expenses incurred by us in the investigation, adjustment, defense and appeal of a claim. . . .
>
> ***
>
> 24) "Pay" means amounts within policy limits for "Damages" because of "Bodily Injury" or "Property Damage" to which this insurance applies, on behalf of a "Member" who incurs a **legally binding obligation to** "Pay", that has been determined by a court, arbitrator or other administrative tribunal during the time they were a CCRRG "Member".

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

(Doc. 56-1 at 23-24, emphasis added.)  There is a critical distinction between these two definitions—"Claims-Paid" includes the defined term "Pay" while "Claims-Made" does not.  In other words, the definition of "Claims-Made" refers only to the *reporting* of a Claim, Occurrence, Medical Incident, or Offense, whereas "Claims-Paid" refers to Claim, Occurrence, Medical Incident, or Offense for which CCRRG has attached an obligation to *"Pay,"* meaning that it will transfer money to satisfy those claims.  Under the policy, "Pay" requires that (1) the insured has a legally binding obligation and (2) the legally binding obligation "has been determined by a court . . . during the time they were a CCRRG 'Member.'"  These terms are not ambiguous.  *Cf. Bank of La. v. Aetna U.S. Healthcare, Inc.*, 571 F. Supp. 2d 728, 734 (E.D. La. 2008) (construing "claims paid" policy, where "the contract language states that Aetna Casualty will indemnify the Bank for 'Contractual Losses' paid during a policy year . . . [which] are defined as 'Benefits paid' by the Bank," and concluding that "the contract terms are clear, explicit, and lead to no absurd consequences; therefore, the contract is not ambiguous").

CCRRG essentially agrees that Capri had a "Claim[] Made."  (Doc. 65 ¶¶ 2, 20.)  But it is undisputed that any legal obligation (consistent with the meaning of the term "Pay") for Capri did not arise until December 2017, which was long after the Policies expired and Capri ceased being a member.  It is therefore irrelevant whether the cancellation was due to bankruptcy, insolvency, manipulation, or a "business decision."[9]  In any case, at the time the Policy terminated and Capri cancelled its membership, there was no legally binding obligation that CCRRG was required to pay within the policy period.

---

[9]     Plaintiffs place heavy emphasis on the circumstances surrounding Capri's cancellation requests in October 2013, which Plaintiffs characterize as an effort by CCRRG to "manipulate[] Capri into [a] sham backdated cancellation request."  (Doc. 132 ¶ 24.)  Plaintiffs may be correct that a reasonable juror could view the evidence in this fashion.  Nevertheless, as discussed throughout this order, the Court does not see how the existence of this factual dispute could be deemed material for summary judgment purposes.  Regardless of whether the cancellation request was retroactive (*i.e.*, effective as of August 1, 2013) or only prospective (*i.e.*, effective as of October 2013), Capri's obligation to Plaintiffs did not become payable until years later.  The analysis of the Bankruptcy Clause set forth above (as well as the analysis of A.R.S. § 20-1123 set forth *infra*) does not turn on whether the cancellation was effective in August 2013 or October 2013.

Plaintiffs' next argument, that CCRRG's Policy is ambiguous because it may not require CCRRG to pay for a *settlement* (Doc. 55 at 11), is immaterial to the present dispute. Plaintiffs are seeking to establish coverage for a *judgment* issued nearly four years after the cancellation of the 2013 Policy and the cessation of Capri's membership.  Whether either Policy would have hypothetically required CCRRG to pay for a settlement executed during the term of membership, before expiration of the Policy, is a question for a different day that need not be resolved here.  *Sletten*, 780 P.2d at 429 ("A finding of 'ambiguity in the air' is insufficient.  The ambiguity must affect the rights of the insured.") (internal citation and quotation omitted).

For similar reasons, Plaintiffs' argument that CCRRG was required to continue defending Capri in the underlying lawsuit (Doc. 55 at 11; Doc. 68 at 4) is irrelevant to whether CCRRG is obligated to provide indemnification for the 2017 judgment.  It is "well settled that a liability insurer's duty to defend is separate from, and broader than, the duty to indemnify."  *Quihuis v. State Farm Mut. Auto. Ins. Co.*, 334 P.3d 719, 727 (Ariz. 2014).

### B.  Invalidation Of Policy Terms

Plaintiffs next identify various reasons why, "[r]egardless of whether the Bankruptcy Clause applies in this context," the asserted limitations on coverage identified by CCRRG are invalid or unenforceable.  (Doc. 55 at 11-16.)

#### 1.  After-Loss Nullification

##### a.  The Parties' Arguments

Plaintiffs' after-loss nullification theory rests in part on A.R.S. § 20-1123, which provides:

> No insurance contract insuring against loss or damage through legal liability for the bodily injury or death by accident of any individual, or for damage to the property of any person, shall be retroactively annulled by any agreement between the insurer and the insured after the occurrence of any injury, death or damage for which the insured may be liable, and any attempted annulment shall be void.

*Id.*  Plaintiffs' theory also rests in part on the "Conformity to Statute" provision within the Policies, which provides:

- 24 -

1
2
3

> Any terms of this policy that are in conflict with any statute or statutes of the state in which this policy is issued are hereby amended to conform to such statute or statutes as required under the Risk Retention Act for a Risk Retention Group.

4    (Doc. 13-1 at 32; Doc. 56-1 at 21.)

5          In light of these provisions, Plaintiffs argue that "the Continuing Membership

6    Conditions purporting to effectuate an after-loss coverage nullification are against public

7    policy, void and unenforceable." (Doc. 55 at 12.) Plaintiffs further argue that, even without

8    § 20-1123 or the Conformity To Statute provision, after-loss nullification of an insurance

9    policy would be "against public policy" when it would "nullify coverage for third party

10   tort victims." (*Id.*) Plaintiffs also argue that the LRRA does not have any preemptive effect

11   here because, under 15 U.S.C. § 3901(b), "the LRRA clearly does not affect state law

12   governing the interpretations of insurance contracts." (*Id.* at 16-17.)

13         In response, CCRRG argues that Plaintiffs' reliance on A.R.S. § 20-1123 is

14   misplaced for two independent reasons: (1) "even if the Arizona statute did apply, there

15   was no retroactive annulment because the Policy only provides coverage on a Claims Paid

16   basis, not an occurrence or a claims-made basis"; and alternatively (2) "[t]he statute does

17   not apply to CCRRG because it is pre-empted by LRRA." (Doc. 64 at 14.) As for the

18   Conformity to Statute clause, CCRRG argues that "[n]otably absent from [Plaintiffs']

19   analysis is any discussion of the fact that the [clause] specifically states that the terms of

20   the Policy will conform to statute 'as required under the Risk Retention Act for a Risk

21   Retention Group.' The [LRRA] preempts Arizona law; it is absurd to contend that this

22   provision supports a contrary conclusion." (*Id.* at 16.) On the topic of preemption, CCRRG

23   notes that the Ninth Circuit has held that "[t]he only substantive policy term a non-

24   chartering state may require is notice to the insured that RRGs are not subject to all of the

25   insurance laws of the non-chartering state." (Doc. 125 at 13, emphasis.) Therefore,

26   CCRRG argues that "Arizona law cannot be used to regulate the substantive terms of the

27   CCRRG Claims Paid Policy and invalidate the claims paid provisions." (Doc. 125 at 14;

28   *see also* Doc. 64 at 7 ["Arizona law cannot be used to regulate the substantive terms of the

- 25 -

CCRRG Claims Paid Policy."].)

In reply, Plaintiffs do not meaningfully address CCRRG's argument that § 20-1123 is inapplicable because there was not, in fact, any retroactive annulment—instead, they simply repeat their earlier argument that "after loss annulment[] of coverage . . . is exactly what CCRRG has done here."  (Doc. 68 at 11.)  As for CCRRG's argument that the Conformity to Statute clause is irrelevant because it only requires conformance to state law "as required under" the LRRA, Plaintiffs respond that "a lay person, untrained in law or insurance, would understand that to mean simply that the LRRA requires the policy to conform to state statutes.  Moreover, even if that language was supposed to convey a limitation on the scope of the clause, how is a lay person supposed to know what is or is not required by the LRRA?  The policy does not disclose any such information and it is unreasonable to expect insureds to dig into the LRRA and understand what it does or does not require."  (*Id.*)  Finally, as for CCRRG's arguments regarding preemption, Plaintiffs characterize them as a "red herring" because "whatever the scope of the LRRA's pre-emption of state law might otherwise be, [§ 3901(b) of] the LRRA expressly says that state law governing the interpretation of insurance contracts is *not* preempted."  (*Id.* at 1-2.)

b.   **Analysis**

Plaintiffs are not entitled to relief based on their after-loss nullification theory.

CCRRG's first defense to this theory is that, even assuming the limitations in A.R.S § 20-1123 are applicable here, those limitations would not actually entitle Plaintiffs to relief.  This issue presents a close call.  On the one hand, as Plaintiffs correctly note in their motion papers, many courts outside Arizona have applied anti-annulment statutes similar to § 20-1123 to prevent insurers from cancelling "claims made" policies after becoming aware of a potential-liability-inducing event but before receiving a formal claim concerning that event.  *See, e.g.*, *Am. Cont'l Ins. Co. v. Steen*, 91 P.3d 864, 866, 870-71 (Wash. 2004) (agreeing that "the early cancellation of a claims-made policy . . . [is] an attempt at a prohibited retroactive 'annulment' . . . under [Washington's anti-annulment statute], where the cancellation does not affect claims the insurer already had notice of, but does affect

claims the insurer does not yet have notice of involving occurrences that happened prior to the cancellation date while the policy was still in force"); *Chandler v. Valentine*, 330 P.3d 1209, 1214 (Okla. 2014) ("PLICO's conduct in cancelling the policy, when it knew that the actions of its insured during the policy period would be the basis of an impending claim, indicates, at best, ignorance of the [Oklahoma's anti-annulment statute].  At worst, it indicates collusion with its insured to deprive the decedent's estate of the benefits of coverage.").

On the other hand, Plaintiffs have not cited any case—and the Court has not identified any case through its own research—suggesting that such anti-annulment statutes should also be construed as prohibiting the cancellation of a "claims paid" policy following the occurrence of a potential liability-inducing event.  And if anti-annulment statutes *did* apply to "claims paid" policies in the manner envisioned by Plaintiffs, it is unclear whether such policies would even be lawful (or viable).  As courts have recognized, a "claims paid" policy covers a different set of risks than a "claims made" or "occurrence" policy.  *Certain Interested Underwriters at Lloyds v. Gulf Nat. Ins. Co.*, 898 F. Supp. 381, 385-86 (N.D. Miss. 1995), *aff'd*, 95 F.3d 48 (5th Cir. 1996) (unpub.) ("[T]he policy obligated Gulf to pay for medical expenses incurred by Tupelo's employees for a one year period prior to the effective date of the policy.  Tupelo thereby gained the benefit of coverage for claims that were merely paid but not incurred during the policy period.  Such a provision is consistent with the nature of a 'claims paid' policy, and lends further credence to a finding that the policy was neither ambiguous nor unconscionable.").  Nevertheless, under Plaintiffs' interpretation of § 20-1123, there would no longer be any tradeoff from the insured's perspective—the policy would not only cover claims paid while the policy was in effect but any potential liability-inducing events that occurred (but had not yet resulted in a binding judgment) during the policy term.  As CCRRG notes in its brief, this would effectively result in "a *gratis* extension of coverage . . . for which CCRRG received no premium."  (Doc. 64 at 10.)  It is difficult to understand how such a result could be reconciled with the Arizona courts' recognition, in the context of "claims made" policies,

1   that "[i]f a court were to allow an extension of reporting time after the end of the policy

2   period, such is tantamount to an extension of coverage to the insured gratis, something for

3   which the insurer has not bargained.  This extension of coverage . . . in effect rewrites the

4   contract between the two parties.  This we cannot and will not do."  *Sletten*, 780 P.2d at

5   430 (citation omitted).

6        In a related vein, it is not clear—in light of the unique features of a "claims paid"

7   policy and how the Arizona courts have construed § 20-1123—that the cancellation of the

8   2013 Policy in this case would qualify as a "retroactive" annulment of coverage, which is

9   what § 20-1123 prohibits.  In *Strojnik v. Gen. Ins. Co. of Am.*, 36 P.3d 1200 (Ariz. Ct. App.

10  2001), the court noted that "[t]he legislature has not . . . defined 'retroactively annulled'"

11  under § 20-1123 and thus "refer[red] to an established and widely used dictionary to glean

12  that term's meaning."  *Id.* at 1205.  Based on that analysis, the court "conclude[d] that § 20-

13  1123 prohibits an insurer and its insured, after the occurrence of any 'injury, death or

14  damage' for which the insured may be liable, from invalidating their insurance policy as

15  of a date prior to the covered event."  *Id.*  But here, Capri and CCRRG did not invalidate

16  the 2013 Policy "as of a date prior to the covered event."  The complaint alleges that Jacob

17  Benson stayed at Capri from "April 21, 2012-May 2012" (Doc. 1-1 at 6), which presumably

18  means the covered event occurred during this time period.  Meanwhile, in October 2013,

19  Capri's agent sent an email to CCRRG requesting the cancellation of the 2013 Policy

20  effective August 1, 2013.  (Doc. 56-14 at 1-2.)  It follows that the invalidation date (October

21  or August 2013) was not "prior to the covered event" (April or May 2012).

22       Alternatively, even assuming Plaintiffs are correct that § 20-1123 would otherwise

23  invalidate the 2013 cancellation attempt, the Court agrees with CCRRG that the LRRA

24  would preempt any such application of § 20-1123.  "When considering whether the LRRA

25  preempts a state law, we first determine whether the challenged aspect of the state law

26  offends the LRRA's broad preemption language.  If so, we consider whether one of the

27  LRRA's exceptions, which are contained in §§ 3902(a)(1) and 3905, applies to save the

28  state law.  If no exception applies, the law is preempted."  *Att'ys Liab. Prot. Soc'y, Inc. v.*

1    *Ingaldson Fitzgerald, P.C.* ("*ALPS*"), 838 F.3d 976, 980 (9th Cir. 2016).

2        In *ALPS*, an Alaska statute prohibited a Montana RRG from recouping funds it spent

3    on independent counsel to defend a non-covered claim pursuant to a reservation of rights.

4    *Id.* The Ninth Circuit held that the Alaska statute "places a restriction on Alaska contracts"

5    that is "not contemplated by the LRRA, and that is not [precluded] by all other states,'"

6    and was therefore covered by the broad preemption provision of 15 U.S.C. § 3902(a)(1).

7    *Id.* at 980-81 (quoting *Wadsworth v. Allied Prof'ls Ins. Co.*, 748 F.3d 100, 108 (2d Cir.

8    2014)). Next, the court considered whether any of the exceptions under the LRRA applied.

9    *Id.* at 981-82. The court concluded that 15 U.S.C. § 3905(c) (which restricts the types of

10   insurance coverage a non-chartering state would allow) could not be used to "regulate

11   general policy terms" because then "non-chartering states could fashion their insurance

12   laws in a way to ensure they fall into this exception, thereby always avoiding preemption."

13   *Id.* The court further explained that "[t]he exceptions announced in § 3902(a)(1) . . . [do

14   not] permit[] the regulation of the substantive terms of policies issued by an RRG. The

15   only substantive policy term a non-chartering state may require is a notice to the insured

16   that RRGs are not subject to all of the insurance laws of the non-chartering state." *Id.* at

17   981.

18       As an initial matter, *ALPS* forecloses Plaintiffs' suggestion that CCRRG's cannot

19   raise a preemption claim here in light of the "preemption carve-out" under § 3901(b) of the

20   LRRA. Section 3901(b) simply provides that the LRRA should not be construed as

21   affecting state law "governing the interpretation of insurance contracts." But as noted in

22   Part II above, CCRRG generally agrees to be bound by Arizona's rules of contract

23   *interpretation* and, as relevant here, only seeks to challenge Arizona's *substantive*

24   regulation of its operations. *ALPS* makes clear that such regulation is generally subject to

25   preemption under the LRRA. *See, e.g.*, 838 F.3d at 980-81 ("The LRRA leaves regulation

26   of an RRG to the state where the RRG is chartered, and broadly preempts 'any [non-

27   chartering] State law, rule, regulation, or order to the extent that such law, rule, regulation,

28   or order would . . . make unlawful, *or regulate, directly or indirectly*, the operation of a

risk retention group.'") (citation omitted and emphasis added); *id.* at 981 ("The only substantive policy term a non-chartering state may require is a notice to the insured that RRGs are not subject to all of the insurance laws of the non-chartering state."); *id.* (rejecting the notion that "non-chartering states could simply 'prohibit' coverage that did not comply with every aspect of state insurance law").[10]

On the merits, it is beyond reasonable dispute that A.R.S. § 20-1123 directly or indirectly "regulates" the "operation" of an RRG. *Allied Pros. Ins. Co. v. Anglesey*, 952 F.3d 1131, 1135 (9th Cir. 2020) ("The LRRA's preemption provision is broadly worded, and [the Ninth Circuit] has repeatedly held that the LRRA has a broad preemptive effect . . . . This broad effect requires that the term 'operation' be read generously."). Section 20-1123 voids the retroactive annulment of an insurance policy after a loss regardless of the policy's language. The existence of such a restriction would hamper an RRG's ability to operate effectively in all 50 states because an otherwise-justified denial of coverage could be voided based on varying individual states' public policies. *Allied Pros. Ins. Co.*, 952 F.3d at 1135-36 ("[The] LRRA was not enacted simply to keep states from discriminating against risk retention groups. Instead, . . . the LRRA was passed by Congress in an effort to support a struggling insurance market. In order to do so, the Act 'eliminated the need for compliance with numerous non-chartering state statutes that, in the aggregate, would

---

[10]     To the extent Plaintiffs (Doc. 55 at 16-17) cite authorities from outside the Ninth Circuit, including *Sturgeon v. Allied Professionals Ins. Co.*, 344 S.W.3d 205 (Mo. App. 2011), in support of their interpretation of § 3901(b), that reliance is misplaced. In *ALPS*, the Ninth Circuit cited with approval the Second Circuit's decision in *Wadsworth*, which in turn rejected the reasoning of *Sturgeon*. *Wadsworth*, 748 F.3d at 108-09. Meanwhile, another out-of-state decision cited by Plaintiffs, *Cobert v. Home Owners Warranty Corp.*, 391 S.E.2d 263 (Va. 1990), arguably undermines rather than supports their position concerning § 3901(b). In *Cobert*, the Virginia Supreme Court held that its contract law on third-party beneficiaries remained intact because of § 3901(b)'s exception for contract interpretation. *Id.* at 265-66. In so finding, it reasoned that "[o]nly state laws which prohibit, or state laws of a non-chartering state which attempt to regulate, directly or indirectly, the formation and operation of approved risk retention groups are preempted." *Id.* (cleaned up ) (quoting *Home Warranty Corp. v. Caldwell*, 777 F.2d 1455, 1473 (11th Cir. 1985)). Setting aside that the Ninth Circuit has generally rejected the Eleventh Circuit's interpretations of the LRRA, *Nat'l Warranty Ins. Co. RRG v. Greenfield*, 214 F.3d 1073, 1082 (9th Cir. 2000), the underlying reasoning in *Cobert* confirms that general state-law principles of contract interpretation remain intact while state laws that substantively regulate the operation of RRGs—such as A.R.S. § 20-1123—are preempted. 391 S.E.2d at 265-66.

thwart the interstate operation of risk retention groups.") (cleaned up).[11]

The final step in the preemption analysis is whether any of the LRRA's exceptions apply. Plaintiffs do not suggest that any exceptions apply—their defense to the preemption claim (Doc. 68 at 1-3; Doc. 131 at 4-5) rises and falls on their mistaken belief that the "preemption carve-out" of § 3901(b) applies here—and the Court independently concludes that the exceptions are inapplicable. The LRRA limits the permissible areas of regulation of a foreign RRG in the foreign state to those listed in 15 U.S.C. § 3902(a)(1)(A)-(I). Those exceptions make it permissible to require RRGs to, for example, "comply with the unfair claim settlement practices law," "pay, on a nondiscriminatory basis, applicable premium and other taxes which are levied on admitted insurers," and "submit to an examination by the State insurance commissioners in any State in which the group is doing business to determine the group's financial condition" under certain circumstances. *Id.* § 3902(a)(1)(A), (B), (E). *See also Allied Pros. Ins. Co.*, 952 F.3d at 1136 ("These exceptions generally authorize nonchartering states to require risk retention groups to comply only with certain basic registration, capitalization, and taxing requirements, as well as various claim settlement and fraudulent practice laws.") (cleaned up). Those exceptions do not, in contrast, permit the application of a state anti-annulment statute to alter the substantive terms of an insurance policy issued by an RRG.[12]

Finally, there is no merit to Plaintiffs' contention that CCRRG agreed, via the Conformity to Statute clause, to be bound by § 20-1123 (or to Plaintiffs' related contention that the Conformity To Statute clause is too confusing for a layperson to understand). In

---

[11]    Plaintiffs cite several out-of-state decisions that would void the purported "retroactive annulment" based on common law public policy. (Doc. 55 at 12-13 [collecting cases].) The persuasive value of these cases is undermined by Arizona's codification of the same principle that is preempted here.

[12]    This conclusion is consistent with the Court's determination, in the November 4, 2022 order, that CCRRG may not rely on LRRA preemption principles for purposes of compelling arbitration. (Doc. 138.) In the November 4, 2022 order, the Court concluded that the LRRA's exceptions were applicable because "the state-law provisions giving rise to the arbitrability dispute [*i.e.*, Arizona's garnishment scheme and Arizona's doctrine of direct-benefits estoppel] are laws of general applicability that do not purport to specifically regulate the business of insurance." (*Id.* at 19 & n.6.) In contrast, A.R.S. § 20-1123 is expressly aimed at insurers and expressly regulates their operation. Thus, the exception in 15 U.S.C. § 3902(a)(4) for generally applicable laws is not implicated.

*ALPS*, the Ninth Circuit considered and rejected a similar argument, characterizing as "circular" the plaintiff's contention that a conformity to statute clause could incorporate an otherwise preempted statute into an RRG's insurance agreement.  838 F.3d at 982 n.4 ("We reject Ingaldson's circular argument that its policy with ALPS has a clause expressly conforming it to Alaska law, thereby incorporating [the challenged state statute] even if it is otherwise preempted.  Alaska law applies only insofar as it is not preempted by federal law.  So even if the policy conforms to Alaska law, Alaska law must conform to the LRRA.").[13]  And as CCRRG noted during oral argument, Plaintiffs' argument is even less persuasive here because the wording of the Conformity to Statute clause in Capri's policies was narrower than the wording of the clause in *ALPS*[14]—here, CCRRG made clear that it was only agreeing to be bound by state law "as required under the [LRRA] for a Risk Retention Group."   This clause unambiguously clarifies that the only state-law requirements being incorporated are those the LRRA requires RRGs to follow (which does not include state anti-annulment statutes).

### 2.   Policy Conditions/Prejudice

#### a.   **The Parties' Arguments**

Plaintiffs' next nullification argument rests on the premise that CCRRG's continuing membership conditions "have nothing whatsoever to do with CCRRG's actuarial assessment of future risks of loss under the policy."   (Doc. 55 at 13-14.)  According to Plaintiffs, the absence of an actuarial basis for these requirements is significant because, under Arizona law, "an insurer bears the burden of providing that a violation of policy conditions has substantially prejudiced the insurer before it can rely on

---

[13]     Plaintiffs also argue that CCRRG "never explained in its policy or elsewhere its position that the LRRA does not require its policy to conform to state law."   (Doc. 68 at 3.)  But the first page of each Policy states, in bold font: "This policy is issued by your risk retention group.  Your risk retention group may not be subject to all of the insurance laws and regulations of your state."   (Doc. 13-1 at 12; Doc. 56-1 at 1.)

[14]     The wording of the conformity to statute clause at issue in *ALPS* does not appear in the Ninth Circuit's decision but can be found in the parties' briefs.  Brief of Defendant-Appellee/Cross-Appellant, 2015 WL 1885067, *3 n.1 ("In addition, the ALPS policy has a conformity clause which reads: 'Any and all provisions of this policy that are in conflict with applicable laws of the jurisdiction wherein this policy is issued are hereby amended to conform to such laws.'").

a breach of those conditions to deny coverage." (*Id.*)  Plaintiffs acknowledge that the case on which they rely, *Lindus v. Northern Insurance Company*, 438 P.2d 311 (Ariz. 1968), does not apply to "claims made" policies because "applying the prejudice rule to such policies would result in a *gratis* extension of coverage to the insured" and may "increase the insurer's exposure including inflation beyond the policy period" but ask the Court to reject that reasoning here because the continuing membership conditions "seek to assure a post claim income stream to fund covered losses and to operate as a forfeiture of coverage where the continuation conditions are not met." (*Id.*)

In response, CCRRG offers what the Court perceives to be three related arguments. (Doc. 64 at 8-11.)  First, CCRRG argues that, as a factual matter, its continuing membership conditions *are* supported by an actuarial assessment of future risk of loss, and indeed "the limitation of coverage to damages and defense costs incurred during an insured's continuing membership with CCRRG is precisely what differentiates the Claims Paid Policy from a 'claims made' policy." (*Id.* at 8-9.)  CCRRG argues that its "Claims Paid Policy is offered at a substantially lower premium than a claims made policy" specifically because the premium "is determined based upon projected damages and projected defense costs to be paid during each respective policy period." (*Id.*)  CCRRG also notes that "claims for those members who discontinue their membership are not included in the calculation of premiums required for the subsequent year," meaning that "no premiums were collected from Capri for defense costs, settlements, and/or judgments beyond the last date of Capri's membership in the risk retention group." (*Id.* at 9.)  CCRRG thus argues that a reinterpretation of the policy to nullify the requirement that Capri be part of CCRRG to maintain coverage would be tantamount to a coverage expansion, which is impermissible under Arizona law. (*Id.* at 9-10.)  Second, in a related vein, CCRRG argues that Plaintiffs' reliance on cases (like *Lindus*) requiring an insurer to make a showing of prejudice before disallowing coverage based on a violation of a policy condition is misplaced because the continuing membership provisions are not "mere 'conditions.'" (*Id.* at 10.)  Third, and alternatively, CCRRG argues that even assuming the continuing membership provisions

qualify as "conditions," "it will suffer significant prejudice if coverage is extended because CCRRG has not received premiums for the four years of coverage being sought by [Plaintiffs]" and "Mr. Bates' testimony and the Policy/Subscription Agreement make it abundantly clear that the continuing membership requirements are 'an essential underwriting feature' of Claims Paid policies." (*Id.*)  CCRRG also argues that membership in the RRG is a requirement under the LRRA and that using a "claims paid" policy serves one of the purposes underlying the LRRA—allowing businesses to be insured for coverage that would "'adhere closely' to their loss experience." (*Id.* at 10-11.)  In closing, CCRRG urges the Court not to "rewrite the policy to provide coverage for the Benson Lawsuit where none exists." (*Id.* at 11.)

Plaintiffs make no additional arguments in reply.

b. **Analysis**

Plaintiffs are not entitled to relief based on their policy conditions/prejudice argument.  In *Lindus*, an insured (Nelson) had a pair of "occurrence" liability policies, but "notice [was] made an express condition precedent to liability under the policies." 438 P.2d at 315.  A coverage dispute arose after Nelson caused the plaintiff (Lindus) to sustain serious injuries during a fire but failed to notify his insurance companies (Northern and Travelers) until 17 months and 24 months, respectively, after the accident.  *Id.*  The trial court denied coverage based on the delay in notification but the Arizona Supreme Court reversed, holding that the insured's failure to comply with the reporting condition did not relieve the companies of liability for an otherwise covered claim unless they showed actual prejudice, which they failed to do.  *Id.* (adopting the rule "that an insurance company cannot prevail on its defense of lack of notice unless they can show prejudice even where notice is made an express condition precedent in the policy").

Critically, *Lindus* does not represent the Arizona courts' last word in this area.  Over 20 years later, in *Sletten*, the Arizona Court of Appeals clarified that the prejudice requirement in *Lindus* "was developed with respect to 'occurrence' policies which provide coverage for negligent conduct occurring during the policy period regardless of when the

claim is made." 780 P.2d at 430. The *Sletten* court went on to hold that this requirement does not apply in cases involving "claims made" policies, because "[c]overage depends on the claim being made and reported to the insurer during the policy period." *Id.* (quoting *Gulf Ins. Co. v. Dolan, Fertig & Curtis*, 433 So.2d 512 (Fla. 1983)). To hold otherwise, the court explained, "would be to convert claims-made policies into occurrence policies," and "[w]e discern no public policy that mandates that only occurrence coverage be sold in Arizona." *Id.* at 430-31.

Similarly, in *Thoracic Cardiovascular Assocs, Ltd. v. St. Paul Fire & Marine Ins. Co.*, 891 P.2d 916 (Ariz. Ct. App. 1995), the court was asked to "decide whether coverage exists under a claims made professional liability insurance policy when a claim is not reported to the insurer within the policy period." *Id.* at 917. Even though the insured "had no knowledge of the [underlying] claim during the policy period" and thus could not have reported it before the expiration of the policy, the Arizona Court of Appeals upheld the insurer's denial of coverage, emphasizing that "[i]n the absence of conflict with statute or public policy, insurers may by unambiguous and clearly noticeable provisions limit their liability and impose such reasonable conditions as they wish upon the obligations they assume by their contract." *Id.* at 921, 923 (quoting *Livingston Parish Sch. Bd. v. Fireman's Fund Am. Ins. Co.*, 282 So.2d 478, 481 (La. 1973)). The court emphasized that because "[a]n insurer who knows that claims will not arise under the policy after its expiration can underwrite a risk and calculate premiums with greater certainty," a "report to the insurer within the policy period is an express condition precedent to coverage." *Id.* at 920. Accordingly, the court concluded it could not excuse the delayed reporting because otherwise it would "essentially convert claims made policies into occurrence policies." *Id.* at 922. The court explained that excusing performance would have constituted "an unbargained-for expansion of coverage, *gratis*, resulting in the insurance company's exposure to a risk substantially broader than that expressly insured against in the policy." *Id.* (quoting *Zuckerman v. Nat'l Union Fire Ins. Co.*, 495 A.2d 395, 406 (N.J. 1985)). The court found it especially compelling that the insured, a doctor, both "elect[ed] to purchase

a claims made policy and [did] not elect to purchase occurrence coverage" and therefore "assume[d] the risk that claims will not be covered unless they are *both* discovered *and* reported during the policy period." *Id.* at 923.

Given this backdrop, Plaintiffs are not entitled to relief.  As an initial matter, although Plaintiffs attempt to frame the issue as a factual inquiry into whether CCRRG would be prejudiced by providing coverage despite Capri's non-compliance with the continuing membership requirement, the Court is not convinced that such an inquiry is required here.  In *Lindus*, the claim fell within the policies' insuring provision—the policies were "occurrence" policies and the claim occurred while the policies were in effect—and the question was whether the insurers could nevertheless deny coverage based on non-compliance with the "condition" of providing notice.  Under those circumstances, the court held that "an insurance company cannot prevail on its defense of lack of notice unless [it] can show prejudice." 438 P.2d at 315.  In contrast, in *Sletten* and *Thoracic Cardiovascular Associates*, the claims did not fall within the policies' insuring provisions—the policies were "claims made" policies, yet neither insured provided the required notice during the policy term—and under those circumstances the courts upheld the denial of coverage without requiring any showing of prejudice.  The Court views this case as much closer to *Sletten* and *Thoracic Cardiovascular Associates* than *Lindus* in that the continuing membership requirement is not some condition of coverage that is untethered to the scope of the insuring provision—the very essence of this "claims paid" policy is that it only covers claims that become payable while the policy remains in effect and the insured remains a member.  Plaintiffs have not identified any case, from any jurisdiction, offering a contrary view concerning how "claims paid" policies should be interpreted or suggesting that an insurer offering a "claims paid" policy must make a factual showing of actuarial harm and prejudice before denying coverage based on the fact that the claim did not become payable during the policy and membership term.

Alternatively, even assuming that a factual showing of prejudice is required in this context, CCRRG has submitted undisputed evidence sufficient to make such a showing.

As CCRRG's representative explained:

> The Claim-Paid Policy coverage offers a substantial discount over Claims-Made and Occurrence coverage and is the single most important part of CCRRG's ability to offer lower cost insurance coverage to its members. The premiums for Claims-Paid coverage are closely tied to loss history experienced by each member insured. Each year at renewal, CCRRG determines the premium for the coming year based upon the projected defense costs and damages <u>to be paid during the next policy period.</u> This calculation includes active and pending claims that have been reported and includes a factor for any new claims that may be reported during the upcoming policy year. Importantly, premiums do not take into account any judgments, settlements or defense costs that will be incurred beyond the policy year. This is precisely why the Claims Paid premiums are substantially lower.

(Doc. 65-14 ¶ 5 [Bates declaration].)[15]  CCRRG's representative further explained that "[l]oss data is aggregated across CCRRG's 32 member-insureds who chose the Claims Paid Policy form, as the risk of losses is shared among the members, and premiums for each insured for that policy year are calculated accordingly. For each subsequent year, CCRRG considers the same information and forecasts the damages and defense costs likely to be incurred during the next year in order to determine appropriate premiums." (*Id.* ¶ 7.) CCRRG's representative concluded: "It would be extremely unfair to the remaining members of the [RRG] (and potentially devastating to the continued viability of the RRG) to require the group to continue to provide Claims Paid coverage to a former member that has cancelled its coverage, has stopped paying premiums and has left the group." (*Id.* ¶ 10.)  Accordingly, the undisputed evidence establishes that CCRRG would suffer prejudice from having to provide indemnification for a judgment that became payable nearly four years after the relevant policies expired and Capri ceased being a member—

---

[15]     Plaintiffs object to this testimony because "[t]here is no foundation for these claims made by Mr. Bates in his declaration," "[t]here is no evidence that he is an actuary or otherwise qualified to render opinions on the actuarial basis for CCRRG's premium assessments and loss expectances," and "there is no evidence that he has or had any involvement in the determination of the amounts of premium to be charged for a so-called 'Claims Paid' policy or that he was in any way involved in the underwriting of any of Capri's policies issued by CCRRG." (Doc. 132 ¶ 9.)  In response, CCRRG submitted another declaration from Bates that explains his qualifications and the foundation for his statements. (Doc. 135 ¶¶ 3-4 ["I am also the President of Magnolia . . . [the] third party claims administrator for CCRRG. In its role as the program manager, Magnolia performed all of CCRRG's underwriting activities for issuance of CCRRG's policies on behalf of CCRRG."].)  Given this showing, Plaintiffs' objections are unavailing.

1    this would be akin to an "unbargained-for expansion of coverage, *gratis*." *Thoracic*

2    *Cardiovascular Assocs.,* 891 P.2d at 922.  *See also Pac. Emps. Ins. Co. v. Superior Ct.,*

3    221 Cal. App. 3d 1348, 1359 (Ct. App. 1990) ("Although the result is coverage more

4    restrictive than that provided by the basic types of professional liability insurance policies,

5    '[a]n insurance company has the right to limit the coverage of a policy issued by it and

6    when it has done so, the plain language of the limitation must be respected.'") (citations

7    omitted).

8                        3.    Freedom Of Contract

9                           a.    **The Parties' Arguments**

10         Plaintiffs' final argument is that the continuing membership requirement violates

11   Capri's freedom of contract.  (Doc. 55 at 14-15.)  According to Plaintiffs, this requirement

12   has the effect of forcing "an Insured to renew and continue coverage with CCRRG for as

13   long as any claim remains unresolved or the insured will forfeit coverage for continuing

14   defense costs and indemnification of any judgment or settlement."  (*Id.* at 15.)  Plaintiffs

15   continue: "As such, where a claim exists, the insured is not free to seek coverage elsewhere,

16   possibly at more reasonable rates, and there is nothing to prevent CCRRG from imposing

17   exorbitant rate increases, assessments, dues and fees on an insured saddled with a claim.

18   Indeed, by drastically increasing its rates in the face of claims, CCRRG could effectively

19   force the insured out of continuing membership, thereby escaping liability for the existing

20   claims even where premium hikes might force an insured into bankruptcy."  (*Id.*)  Based

21   on this reasoning, Plaintiffs conclude that "the Continuing Membership Conditions are

22   void as against public policy."  (*Id.*)  Plaintiffs acknowledge that most courts have upheld

23   "claims paid" policies against freedom-of-contract challenges in light of "the insured's

24   ability to secure coverage from other companies willing to provide retroactive coverage or

25   because the insured could purchase an extended reporting endorsement protecting it against

26   unknown claims," and further acknowledge that Capri was offered an extended reporting

27   endorsement, but argue this offer was illusory because the cost was "300% of the premium

28   charged for the 2013 Policy" and "[i]t would not have granted continued coverage for the

Benson Lawsuit." (*Id.*)

In response, CCRRG argues that Arizona public policy is inapplicable under the LRRA. (Doc. 64 at 11.) CCRRG also argues that Plaintiffs misrepresent the current situation, which involved the following sequence of events: (1) "Capri did not seek to change insurers", (2) "Capri stopped payment on premium checks to CCRRG", (3) "Capri requested CCRRG cancel Capri's insurance coverage", (4) "Capri terminated its membership in the risk retention group," and (5) "Capri sold its business." (*Id.* at 11-12.) CCRRG further argues that Capri was not forced to choose a "claims paid" policy, as it was offered (but declined) a "claims made" policy, and also could have elected coverage with a different carrier. (*Id.* at 12; Doc. 22-1 ¶ 10 [declaration that other coverage was available]; Doc 65-16 [coverage quotes to Capri from CCRRG].) CCRRG emphasizes that Capri received a benefit by electing the less expensive "claims paid" policy after multiple disclosures of the differences between it and other types of coverage. (Doc. 64 at 12; Doc. 64-16.) Finally, CCRRG argues whether Capri would have been able to afford the Extended Reporting Period policy is "speculative and is contrary to the fact that Capri requested and obtained permission from the bankruptcy court to use loan proceeds to pay the premiums to CCRRG to continue its liability insurance." (Doc. 64 at 13; Doc. 64-13 at 3 ¶ 7.) It continues: "While CCRRG can appreciate that it is unfortunate there is no coverage for Plaintiffs' judgment against Capri, Capri alone is responsible for the choices it made. It would be contrary to federal law, contrary to the agreement between the members of the risk retention group, and contrary to Capri's contracts, to impose a coverage obligation where none is due." (Doc. 64 at 14.)

In reply, Plaintiffs argue "the undisputed facts prove that at the time of the cancellation Capri was in default of its payment obligations to CCRRG and out of business, having sold its assets in a bankruptcy sale." (Doc. 68 at 10.) "Given that Capri had sold its assets, including its lease, furniture and fixtures, there was no possible way it could continue to pay premium to CCRRG for [a] business it was no longer operating. Any argument to the contrary is simply absurd." (*Id.*)

1

b. **Analysis**

2      In Arizona, "[t]he freedom to contract has long been considered a 'paramount public

3   policy' under our common law that courts do not lightly infringe." *Zambrano v. M & RC*

4   *II LLC*, 517 P.3d 1168, 1173 (Ariz. 2022).  "Thus, courts will not refuse to enforce a

5   contract merely because one party made a bad deal, even when the terms are harsh." *Id.*

6   "But courts will refuse to enforce a contract term if legislation prohibits the term or when

7   an identifiable public policy clearly outweighs enforcement." *Id.*  "Because the law

8   generally presumes parties are best situated to decide whether contractual terms are

9   beneficial, especially in commercial settings, courts are hesitant to declare terms

10  unenforceable on public policy grounds." *Id.*

11      As explained elsewhere in this order, the Bankruptcy Clause and the obligation to

12  continue membership are reconcilable and unambiguous.  The outcome may seem harsh in

13  this case but there is ample evidence that the possibility of such an outcome was an express

14  part of the bargain.  (Doc. 65-16 [quote form]; Doc 65-15 [letter explaining quote form];

15  Doc. 65-2 [checklist explaining renewal coverage: "In return for typically lower premium

16  costs, the Member agrees either to remain with CCRRG until any pending claim is resolved

17  or has the option to purchase an extended reporting period (ERP) coverage when they leave

18  CCRRG.  If a Member leaves CCRRG with an open claim and does not purchase ERP then

19  the departing member is thus making the election to take the claim with them and handle

20  defense and payment of indemnity out of their 'own pocket.'"].)[16]  Had Capri opted for a

21  more expensive "claims made" policy, CCRRG would have been obligated to provide

22

23   [16]      Plaintiffs contend there are disputes of fact concerning whether Capri's prior owner,
    Mr. Anderson, "knew or understood" the explanations of the "claims paid" language that
24   were provided in the 2013 Policy and subscription agreement.  (Doc. 132 ¶¶ 13, 32-34.)
    This dispute of fact is not material for purposes of Plaintiffs' freedom-of-contract
25   challenge, which only assesses whether the contractual terms violate public policy (not
    whether the insured subjectively understood those terms).  Plaintiffs also dispute whether
26   Capri actually had the ability to purchase an extended reporting period.  (*Id.* ¶ 24.)  But
    Plaintiffs cite no authority (and the Court has not found any) suggesting that whether an
27   insured's financial status precludes the purchase of alternative coverage would somehow
    alter the bargain made at the outset.  Nor are these disputes material for purposes of
28   Plaintiffs' other arguments.  *Sparks*, 647 P.2d at 1132 ("The interpretation of an insurance
    contract is a question of law.").

coverage for Plaintiffs' eventual judgment against Capri.  But Capri, a commercial entity, exercised its freedom of contract to enter into a cheaper "claims paid" policy with different coverage options.  This was a lawful choice under Arizona law, which does not require skilled nursing facilities such as Capri to have liability insurance at all.  (Doc. 64 at 12 [CCRRG's assertion, unrebutted by Plaintiffs, that "Arizona does not require nursing home facilities such as Capri carry any professional liability coverage at all, nor does Arizona mandate required limits or coverage types"].)  Thus, even assuming that Arizona's public policy pertaining to the freedom of contract could be used to invalidate a substantive term of CCRRG's policy with Capri—and as discussed elsewhere in this order, there is a strong argument that any such application of Arizona law would be preempted by the LRRA— that public policy would support, rather than undermine, upholding the terms of the commercial bargain that Capri chose to strike here.  *Cf. Nat'l Bank of Ariz. v. St. Paul Fire & Marine Ins. Co.*, 975 P.2d 711, 713 (Ariz. Ct. App. 1999) ("When the policy language is clear, we may not invent ambiguity and then resolve it to find coverage where none exists under the policy.").

Accordingly,

**IT IS ORDERED** that Plaintiffs' motion for summary judgment (Doc. 55) is **denied** and CCRRG's motion for summary judgment (Doc. 125) is **granted.**

**IT IS FURTHER ORDERED** that judgment is not entered at this time.  Instead, as discussed in footnote four, the parties shall file supplemental briefing on whether Plaintiffs may separately pursue relief in this garnishment action under a breach-of-the-duty-to-defend theory.  Each side's supplemental brief, which shall not exceed seven pages, is due within 14 days of the issuance of this order.

Dated this 6th day of February, 2023.

_____
Dominic W. Lanza
United States District Judge