**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Jacob Benson, et al., | No. CV-18-00006-PHX-DWL |
| Plaintiffs, | **ORDER** |
| v. | |
| Casa De Capri Enterprises LLC, et al., | |
| Defendants. | |

Jacob Benson is a disabled vulnerable adult who received skilled nursing care at a now-defunct facility called Casa de Capri Enterprises LLC ("Capri").  In December 2012, Benson and other family members (together, "Plaintiffs") brought a negligence action against Capri in Arizona state court.

At the time, Capri had a "claims paid" insurance policy issued by Defendant Continuing Care Risk Retention Group, Inc. ("CCRRG").  Under this unusual type of policy, the insurer is only responsible for indemnifying the insured against claims that become payable while the policy remains in effect.  In contrast, under an "occurrence" policy or a "claims made" policy (which are more common), the insurer becomes responsible for indemnification so long as the liability-generating event occurred (or was disclosed to the insurer) during the policy term.

CCRRG initially assumed the defense of Plaintiffs' lawsuit against Capri pursuant to Capri's insurance policy.  However, after Capri became insolvent, stopped paying its premiums, declared bankruptcy, and cancelled the policy, CCRRG withdrew the defense.

Years later, after the bankruptcy stay was lifted, Plaintiffs obtained a $1.5 million judgment against Capri and initiated this garnishment action against CCRRG.

In February 2023, following years of complicated litigation, the Court issued a lengthy order resolving the parties' cross-motions for summary judgment, holding that CCRRG had no duty under the relevant insurance policies to indemnify Capri for the judgment. (Doc. 149.) The Court also noted that it was unclear whether the summary judgment ruling was sufficient to fully dispose of the case, given that Plaintiffs had asserted during oral argument that they "also seek to recover under the theory that CCRRG breached its duty to defend Capri in the underlying lawsuit." (*Id.* at 15 n.4.) After receiving supplemental briefs (Docs. 156, 157), the Court concluded that Plaintiffs adequately disclosed their intention to pursue relief under a duty-to-defend theory. (Doc. 159.) Because the supplemental briefs did not fully address the merits of that theory, the Court authorized the parties to file a second round of summary judgment motions. (*Id.*)

The parties have now done so. (Docs. 160, 162.) For the reasons that follow, CCRRG's motion is granted and Plaintiffs' motion is denied.

## BACKGROUND

I.    Facts

The facts summarized below, and detailed throughout this order, are taken from the parties' summary judgment submissions and other documents in the record. The facts are uncontroverted unless otherwise noted.

On December 10, 2012, Plaintiffs filed suit in Maricopa County Superior Court against Capri, alleging abuse and neglect of a vulnerable adult and negligence. (Doc. 65 ¶ 1.) At the time the lawsuit was served, Capri was insured under a "professional liability insurance policy" issued by CCRRG. (*Id.* ¶ 3.) The policy (the "2012 Policy") provided coverage from January 1, 2012 to January 1, 2013 and had a policy limit of $1 million. (Doc. 56-1 at 36.) Capri renewed its policy with CCRRG the following year (the "2013 Policy"). (Doc. 65 ¶ 4.) The 2013 Policy provided coverage from January 1, 2013 to January 1, 2014. (Doc. 13-1 at 5.) Both policies incorporate by reference a 2009

subscription agreement (Doc. 13-1 at 53-73) and CCRRG's member bylaws (Doc. 65-4). (Doc. 13-1 at 6 [2013 Policy]; Doc. 56-1 at 37 [2012 Policy].)

The 2012 and 2013 Policies are "claims paid" policies. (Doc. 132 ¶ 1.) In the "Coverages" section of each Policy, under the subheading "Insuring Agreement," CCRRG agreed to pay "amounts within the policy limits for 'Damages,' [and] 'Cost of Defense' . . . on behalf of a 'Member' *who becomes legally obligated to 'Pay' 'Damages' and 'Cost of Defense' during the time they are a CCRRG 'Member.'*" (Doc. 13-1 at 13, emphasis added.) In the subscription agreement, CCRRG elaborated that "[t]he terms and conditions of this type of coverage differ significantly from a typical occurrence or claims made indemnification insurance policy. In essence, . . . CCRRG has no responsibility for any portion of a claim not actually paid during the contract period." (*Id.* at 58.)

On its website and in a brochure, CCRRG further addressed this policy language, stating that "[t]he average carrier collects higher premiums to protect itself in advance from the possibility you will change carriers, because their obligation to pay claims persist even after you leave. With [CCRRG], your claims are paid for by the group as long as you are a member. If you have an open claim and decide to leave [CCRRG], the group *stops supporting the claim* so your claim moves with you." (Doc. 164 ¶ 20.) Similarly, in a checklist concerning the renewal of coverage, CCRRG explained: "The result of [a 'claims paid' policy] is that Members pay less on average from year to year. In return for typically lower premium costs, the Member agrees either to remain with CCRRG until any pending claim is resolved or has the option to purchase an extended reporting period (ERP) coverage when they leave CCRRG. If a Member leaves CCRRG with an open claim and does not purchase ERP then the departing member is thus making the election to take the claim with them and *handle defense and payment of indemnity* out of their 'own pocket.'" (Doc. 65-2, emphasis added.)[1]

At the time the Policies were issued, CCRRG was domiciled in South Carolina. (Doc. 164 ¶ 10.) The South Carolina Department of Insurance approved the CCRRG

---

[1]      Plaintiffs dispute that Capri ever received this document. (Doc. 167 at 4 n.1.)

"claims paid" policy form.  (*Id.* ¶ 11.)  Gregory Anderson served as Capri's President and CEO from 2008 through September 2013, when it ceased ongoing operations.  (Doc. 56-9 ¶¶ 5, 15.)  Before 2008, William Fay was Capri's "managing member."  (Doc. 132-2 ¶¶ 1-5.)  Other relevant entities and individuals include Magnolia LTC Management Services ("Magnolia"), which served as the program manager for CCRRG, and Robert "Bob" Bates, who was Magnolia's president and CCRRG's corporate secretary.  (Doc. 65 ¶ 13.)

On December 28, 2012, Capri was served in the Arizona state court lawsuit.  (Doc. 65 ¶ 2.)  It is undisputed that Capri timely reported the lawsuit to CCRRG, as it was required to do under the 2012 Policy.  (*Id.* ¶ 20.)  It is also undisputed that CCRRG accepted Capri's tender under the 2012 Policy and appointed defense counsel to defend the lawsuit without a written reservation of rights.  (*Id.* ¶¶ 21, 23.)

Regarding CCRRG's duty to defend, the 2012 Policy states: "Our right and duty to defend ends when we have exhausted the applicable limit of insurance by the payment of 'Cost of Defense' . . . under this Policy or, when this policy is cancelled or not renewed for any reason, provided however, in the event CCRRG is paying 'Cost of Defense' . . . CCRRG shall continue to pay 'Cost of Defense' . . . for all such 'Claims' for a period of time not to exceed thirty (30) days to enable such former 'Member' to assume its own legal defense."  (Doc. 56-1 at 2.)  The relevant language in the 2013 Policy is identical.  (Doc. 13-1 at 13.)  The subscription agreement further elaborates that:

> In the event a CCRRG Member fails to pay any Assessment or Dues, Premiums or any payment required by the CCRRG agreement for deferred payment of Surplus when the same is due . . . CCRRG may terminate such member's Membership status if the failure to pay is not cured within ten (10) days . . . .  Upon such termination, the former Member shall not be entitled to the return of all or any part of their Surplus Contribution, and the professional liability insurance services in compliance with and as reflected in this agreement shall thereupon terminate, as to all Claims then pending against such former Member . . . .  However, in the event CCRRG is then providing the legal defense services described in compliance with and as reflected in this agreement to such former member, CCRRG shall continue to provide such legal defense services for a period of time not [to] exceed thirty (30) [sic] to allow for a reasonable period of time to enable such former Member to assume their own legal defense.

(*Id.* at 64-65.)

After CCRRG began providing a defense of the lawsuit, Capri defaulted on its obligation to pay certain deductibles. (Doc. 65 ¶ 24.) As a result, Magnolia, through Bates, sent Capri a letter on July 15, 2013 informing Capri of its "seriously delinquent" status "in meeting its insurance deductible payment obligations." (Doc. 56-6 at 1-2.) The letter stated that CCRRG's board of directors could terminate Capri's membership for the outstanding delinquencies, in which case "Capri's right to continued coverage of existing open claims . . . may be at risk if the outstanding default in payment is not cured to the satisfaction of the [board]." (*Id.* at 1.)

On July 19, 2013, CCRRG and Capri agreed to a payment plan concerning the outstanding deductible obligation. (Doc. 65 ¶ 25.) Less than one month into that plan, Capri again defaulted. (*Id.*) As a result, CCRRG again threatened action against Capri. (*Id.*)

On August 13, 2013, CCRRG issued a notice of intent to cancel the 2013 Policy, which stated that the Policy would be cancelled if Capri did not pay $22,270.03 by August 27, 2013. (Doc. 56-8 at 1; Doc. 65 ¶ 26.)

On August 19, 2013, Capri filed for bankruptcy. (Doc. 65 ¶ 27.) Afterward, Plaintiffs' lawsuit against Capri was stayed. (Doc. 1-1 at 54-55, 58-59, 62.)

By August 22, 2013, CCRRG received notice of the bankruptcy. (Doc. 65 ¶ 33.) That same day, the bankruptcy court authorized a debtor in possession loan for Capri "to immediately pay the . . . monthly premium for liability insurance of approximately $30,000." (Doc. 65-13 at 3 ¶ 7.)

On September 6, 2013, CCRRG rescinded its previously issued notice of intent to cancel. (Doc. 64 ¶ 35; Doc. 56-13.)

On September 20, 2013, the bankruptcy court approved the sale of Capri's assets to an unrelated party. (Doc. 65 ¶ 36.)

On September 25, 2013, Capri stopped payment on a pair of premium checks it had previously sent to CCRRG, which CCRRG had not yet deposited in light of the bankruptcy proceeding. (Doc. 65 ¶ 37.)

On October 18, 2013, Capri's agent sent an email to CCRRG requesting the cancellation of the 2013 Policy "effective 8/1/13."  (Doc. 56-14 at 1-2.)

Capri had the option to purchase an "Extended Reporting Period" upon cancellation of the 2013 Policy, which would have had the effect of maintaining coverage for existing claims that had not yet been paid.  (Doc. 164 ¶ 30.)  The premium for the Extended Reporting Period would have been "300% of the premium charged for the annualized 2013 Policy, or approximately $599,328.90."  (*Id.* ¶ 32.)  It is undisputed that Capri declined to purchase the Extended Reporting Period, although the parties previously disputed Capri's reasons for doing so.

On November 19, 2013, CCRRG (via Magnolia) sent a letter to Capri confirming that the 2013 Policy had been terminated as of August 1, 2013.  (Doc. 65-19.)  This letter further provided:

> This is a courtesy reminder that [Capri] elected to cancel its membership in the Continuing Care Risk Retention Group (CCRRG), which membership was terminated on August 1, 2013 and, (ii) as a result of that cessation of membership, the obligation of CCRRG to make any payments under the above policy for indemnity ended as of that day.  Moreover, the obligation of CCRRG to pay for the defense of the above claim ended thirty (30) days after the cessation of membership, or on August 31, 2013.

(*Id.* at 1.)

On August 14, 2014, defense counsel withdrew from representing Capri in Plaintiffs' lawsuit.  (Doc. 65 ¶ 47; Doc 1-1 at 65-66.)

On October 1, 2014, CCRRG (via Magnolia) informed Plaintiffs' counsel that CCRRG's insurance coverage for the claims in Plaintiffs' lawsuit "ceased" when Capri was no longer a member and the "policy was no longer in force."  (Doc. 65 ¶ 46 [undisputed that the email was sent].)

In March 2015, Plaintiffs tendered a policy limits settlement demand to CCRRG, which was rejected.  (Doc. 65 ¶¶ 48-49.)  Plaintiffs then sought and obtained relief from the bankruptcy stay "in order to proceed to judgment against Capri"; the resulting order from the bankruptcy court stated that Plaintiffs could not "seek to enforce any such judgment against the estate."  (Doc. 65 ¶ 49; Doc. 56-20 at 2.)

Plaintiffs ultimately prevailed in their lawsuit against Capri. (Doc. 65 ¶ 50.) On November 29, 2017, the superior court entered a final judgment in Plaintiffs' favor in the amount of $1,501,069.90. (*Id.*)

On December 18, 2017, Plaintiffs applied for a writ of garnishment against CCRRG. (Doc. 1-2 at 233-35.) In their application for the writ, Plaintiffs asserted that "[CCRRG] owes [Capri] money which was not earned by [Capri] for personal services" and "[CCRRG] is holding money for [Capri] which is not exempt from collection." (*Id.* at 234-35.) CCRRG answered that "[it] was not holding personal property or money belonging to [Capri]." (Doc. 29 at 3.)

II.   Relevant Procedural History

On January 2, 2018, CCRRG removed the garnishment action to federal court. (Doc. 1.)

On January 9, 2018, CCRRG moved to dismiss, or, alternatively, to stay litigation and compel arbitration. (Doc. 13.) On August 17, 2018, Judge Logan issued an order denying CCRRG's motion.[2] (Doc. 27.)

On March 2, 2019, Plaintiffs moved for summary judgment. (Doc. 55.)

On April 18, 2019, CCRRG filed a renewed motion to compel arbitration. (Doc. 63.)

On July 30, 2019, the Court granted CCRRG's renewed motion to compel arbitration, denied Plaintiffs' motion for summary judgment as moot, and dismissed the case without prejudice. (Doc. 88.)

Plaintiffs appealed the order compelling arbitration. (Doc. 93.) In November 2020, after full briefing and oral argument, the Ninth Circuit certified two questions of law to the Arizona Supreme Court. *Benson v. Casa de Capri Enters., LLC*, 980 F.3d 1328, 1332-33 (9th Cir. 2020) ("We therefore certify the following questions to the Arizona Supreme Court: 1) In a garnishment action by a judgment creditor against the judgment debtor's

---

[2]   This case was originally assigned to Judge Logan and was transferred to the undersigned on October 31, 2018. (Doc. 35.)

insurer claiming that coverage is owed under an insurance policy, where the judgment creditor is not proceeding on an assignment of rights, can the insurer invoke the doctrine of direct benefits estoppel to bind the judgment creditor to the terms of the insurance contract?  2) If yes, does direct benefits estoppel also bind the judgment creditor to the arbitration clause contained in the insurance policy?").

In January 2022, the Arizona Supreme Court resolved the first question in Plaintiffs' favor, holding that "the doctrine of direct benefits estoppel can[not] be applied in an Arizona garnishment proceeding." *Benson v. Casa de Capri Enters., LLC*, 502 P.3d 461, 465 (Ariz. 2022).  Based on this ruling, the Ninth Circuit issued an amended memorandum decision in March 2022 concluding that "the district court erred in granting CCRRG's motion to compel arbitration under the doctrine of direct benefits estoppel." *Benson v. Casa de Capri Enters.*, *LLC*, 2022 WL 822126, *1 (9th Cir. 2022).  In a footnote, the Ninth Circuit added: "CCRRG alternatively argues that the Liability Risk Retention Act of 1986 (LRRA) preempts state law governing the operation of risk retention groups, and apparently by extension precludes Arizona from limiting arbitration provisions in insurance policies provided by a risk retention group.  The district court did not address this argument and [Plaintiffs] argue that CCRRG did not adequately raise it below.  We leave these matters to the district court in the first instance." *Id.* at *2 n.1.

On June 7, 2022, after reviewing post-remand briefing from the parties (Docs. 112, 113), the Court permitted CCRRG to file its own motion for summary judgment.  (Doc. 115.)  The parties also filed a joint request to further brief the LRRA preemption issue on an accelerated basis (Doc. 117), which the Court granted (Doc. 118).  The parties then filed additional briefs on LRRA preemption.  (Docs. 119, 120, 123.)

On July 21, 2022, CCRRG filed its first motion for summary judgment.  (Doc. 125.)

On November 4, 2022, the Court denied CCRRG's renewed motion to compel arbitration based on LRRA preemption.  (Doc. 138.)

On November 22, 2022, CCRRG appealed the Court's denial of the renewed motion to compel arbitration.  (Doc. 139.)

On December 15, 2022, CCRRG filed a motion to stay proceedings pending its appeal of the November 4, 2022 order denying arbitration.  (Doc. 141.)

On January 9, 2023, the Court denied the stay request (Doc. 144) and noted that "[a]lthough some circuits hold that a district court must always stay the merits of a case pending a non-frivolous appeal from the denial of a motion to compel arbitration, the rule in the Ninth Circuit—at least for now—is that the issuance of such a stay is discretionary." (*Id.* at 3 [citing *Britton v. Co-op Banking Group*, 916 F.2d 1405, 1411-12 (9th Cir. 1990)].)

On February 6, 2023, the Court granted CCRRG's motion for summary judgment and denied Plaintiffs' motion.  (Doc. 149.)  The Court concluded that, for various reasons, the 2012 and 2013 Policies did not require CCRRG to indemnify Capri for Plaintiffs' 2017 judgment.  The Court also solicited supplemental briefing on whether Plaintiffs had separately asserted a garnishment claim premised on the theory that CCRRG had breached its duty to defend Capri in the underlying lawsuit.  (*Id.* at 15 n.4, 41.)

On April 11, 2023, the Court concluded that Plaintiffs had adequately disclosed their intention to pursue relief under a duty-to-defend theory.  (Doc. 159.)  The Court authorized the parties to file successive summary judgment motions limited to that theory.  (*Id.*)

On May 11, 2023, CCRRG and Plaintiffs filed cross-motions for summary judgment.  (Docs. 160, 162.)

On June 12, 2023, CCRRG and Plaintiffs each filed a response to the other party's motion.  (Docs. 165, 167.)

On June 26, 2023, the Court issued an order explaining that the Supreme Court's just-issued ruling in *Coinbase, Inc. v. Bielski*, 599 U.S. 736 (2023), called into doubt its previous order declining to stay the proceedings pending CCRRG's appeal from denial of its renewed motion to compel arbitration.  (Doc. 170.)

On July 3, 2023, after the parties declined to submit briefing on *Coinbase*, the Court issued a stay pending the resolution of CCRRG's arbitration-related appeal.  (Doc. 171.)

On November 20, 2023, the Ninth Circuit affirmed this Court's order denying CCRRG's renewed motion to compel arbitration.  (Doc. 176-1.)

On January 8, 2024, the Ninth Circuit issued the mandate. (Doc. 176.)

On January 10, 2024, the Court granted CCRRG's unopposed motion to stay proceedings pending the resolution of its petition for certiorari. (Doc. 175.)

On May 28, 2024, the Supreme Court denied CCRRG's petition for certiorari. *Continuing Care Risk Group v. Benson*, 2024 WL 2709359 (2024).

On April 1, 2024, the stay expired. (Doc. 177.)

On June 25, 2024, the Court *sua sponte* extended the deadline to file reply briefs in support of the renewed summary judgment motions the parties had filed in May 2023. (*Id.*)

On July 16, 2024, CCRRG and Plaintiffs each filed a reply. (Docs. 178, 179.)

On November 20, 2024, the Court issued a tentative ruling. (Doc. 182.)

On December 3, 2024, the Court heard oral argument. (Doc. 183.)

## LEGAL STANDARD

"The court shall grant summary judgment if [a] movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' only if it might affect the outcome of the case, and a dispute is 'genuine' only if a reasonable trier of fact could resolve the issue in the non-movant's favor." *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125 (9th Cir. 2014). The court "must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inference[s] in the nonmoving party's favor." *Rookaird v. BNSF Ry. Co.*, 908 F.3d 451, 459 (9th Cir. 2018). "Summary judgment is improper where divergent ultimate inferences may reasonably be drawn from the undisputed facts." *Fresno Motors*, 771 F.3d at 1125.

A party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "In order to carry its burden of production, the moving party must either produce evidence negating an essential element

of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). "If . . . [the] moving party carries its burden of production, the nonmoving party must produce evidence to support its claim or defense." *Id.* at 1103.

"If the nonmoving party fails to produce enough evidence to create a genuine issue of material fact, the moving party wins the motion for summary judgment." *Id.* There is no issue for trial unless enough evidence favors the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (cleaned up). At the same time, the evidence of the non-movant is "to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. "[I]n ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden." *Id.* at 254. Thus, "the trial judge's summary judgment inquiry as to whether a genuine issue exists will be whether the evidence presented is such that a jury applying that evidentiary standard could reasonably find for either the plaintiff or the defendant." *Id.* at 255.

"[W]hen parties submit cross-motions for summary judgment, [e]ach motion must be considered on its own merits," but the Court must consider all evidence submitted in support of both cross-motions when separately reviewing the merits of each motion. *Fair Hous. Council of Riverside Cty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001) (quotation marks omitted). For "the party with the burden of persuasion at trial"—usually the plaintiff—to succeed in obtaining summary judgment in its favor, it "must establish beyond controversy every essential element" of each claim on which summary judgment is sought. *S. California Gas Co. v. City of Santa Ana*, 336 F.3d 885, 888 (9th Cir. 2003). The party without the burden of persuasion at trial—usually the defendant—is entitled to summary judgment where it establishes that the party with the burden of persuasion will be unable to prove at least one element of its claim in light of the undisputed facts. *Celotex*

1    *Corp.*, 477 U.S. at 322-23.  This distinction reflects that the burden is ultimately on the

2    proponent of each claim to prove it.  *Id.*  ("Rule 56(c) mandates the entry of summary

3    judgment, after adequate time for discovery and upon motion, against a party who fails to

4    make a showing sufficient to establish the existence of an element essential to that party's

5    case, and on which that party will bear the burden of proof at trial.  In such a situation,

6    there can be 'no genuine issue as to any material fact,' since a complete failure of proof

7    concerning an essential element of the nonmoving party's case necessarily renders all other

8    facts immaterial.").

9                                    **DISCUSSION**

10   I.    Applicable Law

11           When evaluating the parties' earlier cross-motions for summary judgment, the Court

12   noted that "at least with respect to the law generally governing contract interpretation, the

13   parties appear to agree that the Court should apply Arizona law."  (Doc. 149 at 12.)  The

14   same appears true here.[3]  Although the latest motions do not discuss choice of law, both

15   sides rely on Arizona law in support of their arguments.  (Docs. 160, 162.)  *See also St.*

16   *Paul Fire & Marine Ins. Co. v. Ohio Cas. Ins. Co.*, 2014 WL 1285824, *3 (D. Ariz. 2014)

17   ("Arizona adheres to Restatement (Second) of Conflict of Laws § 193 (1971), which states

18   that insurance contracts are generally governed 'by the local law of the state which the

19   parties understood was to be the principal location of the insured risk during the term of

20   the policy.'  Since the principal location of the insured risk was in Arizona, Arizona law

21   governs the Policies.") (internal citations omitted).

22           Under Arizona law, "[t]he interpretation of an insurance contract is a question of

23   law."  *Sparks v. Republic Nat'l Life Ins. Co.*, 647 P.2d 1127, 1132 (Ariz. 1982).  "[W]here

24   the provisions of the contract are plain and unambiguous upon their face, they must be

25   applied as written, and the court will not pervert or do violence to the language used, or

26   expand it [beyond] its plain and ordinary meaning or add something to the contract which

27   ─────────────

28   [3]        CCRRG contends that, in certain respects "Arizona law is pre-empted by the
     LRRA."  (Doc. 165 at 3.  *See also* Doc. 162 at 7.)  It is unnecessary to resolve this argument
     in light of the conclusions reached below.

the parties have not put there." *D.M.A.F.B. Fed. Credit Union v. Emps. Mut. Liab. Ins. Co. of Wis.*, 396 P.2d 20, 23 (Ariz. 1964). "To determine the plain meaning of a term," Arizona courts "refer to established and widely used dictionaries." *W. Corr. Grp., Inc. v. Tierney*, 96 P.3d 1070, 1074 (Ariz. Ct. App. 2004) (citing *State v. Wise*, 671 P.2d 909, 911 n.3 (Ariz. 1983)).

An insurance policy "must be read as a whole, so as to give a reasonable and harmonious effect to all of its provisions." *Charbonneau v. Blue Cross*, 634 P.2d 972, 975 (Ariz. Ct. App. 2007). Further, "[i]n the insurer/insured context . . . Arizona's public policy protects insureds. Hence Arizona law requires that undefined terms be given the meaning used by laypeople in everyday usage and that terms and provisions that remain ambiguous after all relevant considerations be interpreted in favor of coverage and against the insurer." *Equity Income Partners, LP v. Chi. Title Ins. Co.*, 387 P.3d 1263, 1268 (Ariz. 2017).

"If a policy is subject to 'conflicting reasonable interpretations,' it is ambiguous." *Teufel v. Am. Fam. Mut. Ins. Co.*, 419 P.3d 546, 548 (Ariz. 2018) (citation omitted). However, "[a] contract is not ambiguous just because the parties to it or, as here, a party to it and the other party's successor, disagree about its meaning. Language in a contract is ambiguous only when it can reasonably be construed to have more than one meaning." *In re Estate of Lamparella*, 109 P.3d 959, 963 (Ariz. Ct. App. 2005) (internal citations omitted). "In determining whether an ambiguity exists in a[n insurance] policy, the language should be examined from the viewpoint of one not trained in law or in the insurance business." *Sparks*, 647 P.2d at 1132. If the policy term is still ambiguous after considering the term's plain and ordinary meaning, Arizona courts consider "legislative goals, social policy, and the transaction as a whole." *First Am. Title Ins. Co. v. Action Acquisitions, LLC*, 187 P.3d 1107, 1110 (Ariz. 2008). If these interpretive guides fail to "elucidate a clause's meaning," a court should construe the clause against the insurer. *Id.*

"Generally, the insured bears the burden to establish coverage under an insuring clause, and the insurer bears the burden to establish the applicability of any exclusion." *Keggi v. Northbrook Prop. & Cas. Ins. Co.*, 13 P.3d 785, 788 (Ariz. Ct. App. 2000).

1    II.    Overview Of The Parties' Arguments

2        Similar to the last round of summary judgment motions, the parties' cross-motions

3    raise an array of arguments that sometimes overlap.  Accordingly, the Court will begin by

4    providing a brief overview of the parties' positions.

5        CCRRG identifies four reasons why it is entitled to summary judgment on any

6    garnishment claim premised on a duty-to-defend theory.  (Doc. 162.)  First, CCRRG argues

7    that, on the merits, it "did not breach its contractual duty to defend Capri."  (*Id.* at 1.)

8    According to CCRRG, "[b]ecause Capri did not purchase the Extended Reporting

9    Endorsement, by the plain language of the CCRRG Claims Paid Policy's Insuring

10    Agreement, coverage for [Plaintiffs'] Lawsuit—including both damages and cost of

11    defense—ceased upon Capri's cancellation of its Membership and Policy."  (*Id.* at 7.)

12    CCRRG adds: "[I]t is undisputed that CCRRG initially provided a defense to Capri. . . .  It

13    was not until after Capri terminated its Membership and cancelled its Policy with CCRRG,

14    filed bankruptcy, and ceased to exist, that CCRRG withdrew from Capri's defense, as was

15    its right under the terms of the Claims Paid Policy and Subscription Agreement that this

16    Court has already found to be 'plain' and 'unambiguous.'  Capri's defense counsel did not

17    withdraw from the defense of the underlying Benson-Capri Lawsuit until August 14, 2014.

18    [Plaintiffs] have disclosed no evidence to the contrary."  (*Id.* at 9.)  Second, CCRRG argues

19    that any garnishment claim premised on an alleged breach of the duty to defend also fails

20    because Plaintiffs have presented no proof that Capri was damaged by that breach.  (*Id.* at

21    9-12.)  Third, CCRRG argues that Plaintiffs cannot, in any event, premise a garnishment

22    claim on a duty-to-defend theory .  (*Id.* at 12-15.)  Fourth, CCRRG contends that Plaintiffs

23    are judicially estopped from claiming an assignment of Capri's contractual rights because

24    they previously disavowed any such assignment in an effort to avoid arbitration.  (*Id.* at

25    15-17.)

26        Plaintiffs argue that CCRRG had an ongoing duty to defend Capri against claims

27    covered by the 2012 Policy.  (Doc. 160 at 2.)  Plaintiffs contend that because that duty

28    remained in place even after Capri's cancellation of the 2013 Policy, CCRRG violated its

duty to defend when it withdrew from Capri's defense in 2014.  (*Id.* at 7.)  Plaintiffs further argue that the duty to defend is broader than the duty to indemnify and "[a]n insurer's breach of the duty to defend subjects the insurer to more liability than it otherwise would have had if it had defended."  (*Id.* at 3, 7, citation omitted.)   According to Plaintiffs, CCRRG's violation of the duty to defend necessarily damaged Capri, because it is "well known and understood" that "uncontested default hearings result in greater liability than would likely otherwise be obtained after a fully contested trial on the merits," and Capri was damaged in an amount equal to Plaintiffs' default judgment.  (*Id.* at 12-14.)

III.   <u>CCRRG's Duty To Defend</u>

It is undisputed that CCRRG had a duty to defend Capri in 2012 when Plaintiffs first sued Capri.  The parties' disagreement is over when that duty ended.[4]  CCRRG argues that its "Claims Paid Policy provides coverage for Member-Insureds only while they are Member-Insureds."  (Doc. 162 at 3, emphasis omitted.)  In contrast, Plaintiffs argue that "under the wording of the operative insuring clause, including the express language describing CCRRG's duty to defend and, more particularly when the duty ends, CCRRG obligated itself to continue to defend so long as the insured kept the triggered policy in place and renewed that policy at least once."  (Doc. 160 at 4.  *See also* Doc. 167 at 1 ["CCRRG was obligated . . . to continue to provide a defense so long as the policy limit was not exhausted and the 2012 Policy was kept in force throughout its term and was then renewed."].)  These two proposed interpretations are discussed in turn.

A.   **Continuing Membership Requirement**

1.   <u>The Parties' Arguments</u>

The heart of CCRRG's argument is that "Membership must be maintained to have access to the benefit of professional liability insurance coverage from CCRRG."  (Doc. 162 at 3.)  These membership requirements, CCRRG argues, are "clearly outlined" (*id.*) in

---

[4]    The parties' briefs discuss, in extensive detail, the differences between the duty to defend and the duty to indemnify and how those doctrines sometimes intertwine.  It is unnecessary to resolve some of the parties' disagreements over those issues in light of the conclusions reached in this order.

Coverage A, paragraph 1, which reads:

> [CCRRG] will "Pay" amounts within policy limits for "Damages" [and] "Cost of Defense," . . . to which this insurance applies, on behalf of a "Member" who becomes legally obligated to "Pay" "Damages" and "Cost of Defense" during the time they are a CCRRG "Member".

(Doc. 56-1 at 2.)  CCRRG emphasizes the final clause of this provision, editing it to read: "We will 'Pay' . . . 'Cost of Defense' during the time they are a CCRRG 'Member.'"  (Doc. 162 at 3, emphasis omitted.)  Elsewhere, CCRRG substitutes the parties' names in an attempt to further drive the point home, arguing that "the CCRRG Policy plainly provides coverage for 'Cost of Defense during the time [Capri] [was] a CCRRG Member.'"  (Doc. 165 at 5, cleaned up.)  This reading, according to CCRRG, is consistent with the LRRA, which "mandates that for any entity to participate in RRG's insurance coverage, the entity must be a Member and an insured of the RRG."  (*Id.* at 2, emphasis in original.)[5]  CCRRG contends that it fulfilled its duty to defend Capri until "Capri terminated its Member-Insured status, the duty to defend ceased, and CCRRG properly withdrew from the defense."  (*Id.* at 5.)  CCRRG argues that its position is further supported by the 2009 subscription agreement, which is incorporated by reference in each Policy and provides that "CCRRG has no responsibility to pay for any portion of a claim not actually paid during the contract period."  (Doc. 162 at 5, emphasis omitted.)  CCRRG also argues that its proffered interpretation is supported by the portion of the Policy dealing with the "Extended Reporting Endorsement."  (*Id.* at 6-7.)  Under this provision, "coverage on reported claims cease[s] upon cancellation unless an[] unlimited Extended Reporting Period is purchased on the cancelled policy as set forth and upon the terms and Conditions in the CCRRG Articles, By-Laws, Subscription Agreement and this policy."  (Doc. 13-1 at 34.)

Plaintiffs argue that the above-cited provisions are "confusing at best" because "an

---

[5] Because the Court concludes that CCRRG was only obligated under the 2012 Policy to defend Capri so long as it remained a CCRRG member, it is unnecessary to decide whether the LRRA mandates in all instances that an entity must be an RRG member to receive coverage.

insured 'Member' does not become legally obligated to 'Pay' defense costs." (Doc. 160 at 5.) According to Plaintiffs, this confusion is amplified by the definition of "Pay" provided in the 2012 Policy, which is:

> "Pay" means amounts within policy limits for "Damages" because of "Bodily Injury" or "Property Damage" to which this insurance applies, on behalf of a "Member" who incurs a legally binding obligation to "Pay", that has been determined by a court, arbitrator, or other administrative tribunal during the time they were a CCRRG "Member".

(Doc. 56-1 at 24.) According to Plaintiffs, this definition "relates only, as most lay people would expect, to 'Damages.'" (Doc. 160 at 5.) Plaintiffs contend that "the defined word 'Pay' has nothing whatsoever to do with CCRRG's duty to defend or defense costs" and instead suggests, contrary to common sense, that CCRRG is only required to "Pay" defense costs when that obligation has been determined by a court, arbitrator, or administrative tribunal. (*Id.*) In light of these features, Plaintiffs contend that "it is quite obvious that the language of [this provision] is at least ambiguous when compared to the clear continuing duty to defend language." (*Id.*) In their response brief, Plaintiffs also argue that "ambiguity . . . should be construed against CCRRG." (Doc. 167 at 3.) "[T]his is not," Plaintiffs argue, "just an 'ambiguity in the air.' Rather, it relates directly to the ambiguous and confusing language of the insuring clause of Coverage A, paragraph 1." (Doc. 160 at 5-6.) According to Plaintiffs, "a reasonable person would expect that the clause that is specifically devoted to the duty to defend, and which expressly states when that duty ends, controls over the other confusing terms . . . ." (*Id.* at 6.) As for the subscription agreement, Plaintiffs contend that "[i]t refers only to CCRRG's duty to pay claims under the triggered policy," not the duty to defend. (Doc. 167 at 3.) Plaintiffs also emphasize that the subscription agreement was "signed by a former Capri executive, Don Pierce, years before the triggered 2012 Policy." (*Id.*) In their reply brief, Plaintiffs characterize the subscription agreement as "an extrinsic and collateral document incorporated into the Policy only by reference" and argue that such a document is "not where an ordinary insured would look to check on its rights." (Doc. 178 at 4-5.) According to Plaintiffs, policy language should be controlling over an "extrinsic membership agreement or other extrinsic forms upon which CCRRG now relies

1    to claim that its duty to defend terminated when a later policy is canceled." (*Id.* at 3.)

2        In response and in reply, CCRRG "rejects Capri's argument that the definition of

3    'Pay' conflicts with CCRRG's position that the duty to defend or pay defense costs is

4    limited to the duration of the Member-Insured's continuing Membership." (Doc. 165 at 8-

5    9.) In addition, CCRRG reiterates that, under the subscription agreement, it "has no

6    responsibility to pay for any portion of a claim not actually paid during the contract period."

7    (*Id.* at 9, emphasis omitted.) The phrase "portion of the claim," according to CCRRG,

8    "includes defense costs." (*Id.*).

9                    2.    <u>Analysis</u>

10        In the earlier summary judgment order, the Court determined that "the continuing

11    membership requirement is not some condition of coverage that is untethered to the scope

12    of the insuring provision—the very essence of this 'claims paid' policy is that it only covers

13    claims that become payable while the policy remains in effect and the insured remains a

14    member." (Doc. 149 at 36.) In reaching that conclusion, the Court analyzed the very same

15    provision of the 2012 Policy on which CCRRG now relies for the proposition that Capri

16    needed to maintain membership for CCRRG to "'Pay' . . . 'Cost of Defense.'" This

17    provision outlines CCRRG's duty to pay "Damages" and "Cost of Defense" but limits

18    those obligations by requiring that the party maintain membership with the risk retention

19    group. (Doc. 56-1 at 2.) This structure is highly probative of the contract's meaning and

20    suggests that CCRRG's duty to defend is limited in the same manner as its duty to

21    indemnify.

22        Plaintiffs correctly point out that some aspects of this provision are potentially

23    "confusing" when applied to "Cost of Defense." For example, although this provision

24    places the term "Cost of Defense" in quotation marks (*id.* at 2)—a convention that suggests

25    it is a defined term whose specific definition will be provided elsewhere—the "Definitions"

26    section of the 2012 Policy (*id.* at 22-26) does not provide such a definition. Additionally,

27    although this provision obligates CCRRG to "Pay" the "Cost of Defense" under certain

28    circumstances, Plaintiffs correctly observe that the definition of "Pay" that appears

elsewhere in the 2012 Policy is unusually narrow, such that "an insured would have to obtain . . . a determination from a court, arbitrator, or administrative tribunal in order to receive the benefit of CCRRG's duty to defend."  (Doc. 160 at 5.)[6]

Although these features of the 2012 Policy reveal a lack of attention to detail, they do not undermine CCRRG's position here or otherwise detract from the clear ongoing membership requirement.  Ambiguities in an insurance policy are sometimes construed against the insurer.  *First Am. Title Ins. Co.*, 187 P.3d at 1110 ("The court of appeals erred in saying that we have 'abandoned' the rule that ambiguities are construed against the insurer.  That rule remains; we simply do not resort to it unless other interpretive guides fail to elucidate a clause's meaning.")  However, "[a] finding of ambiguity in the air is insufficient.  The ambiguity must affect the rights of the insured."  *Sletten v. St. Paul Fire & Marine Ins. Co.*, 780 P.2d 428, 429 (Ariz. Ct. App. 1989) (cleaned up.)  In *Sletten*, the trial court determined that an insurance policy was ambiguous because the word "claim" was given two different meanings: (1) "a formal claim by patient against doctor"; and (2) "a report of potential liability by doctor to insurer."  *Id.* at 429.  The appellate court reversed because, under either definition, "no such claim was made during the policy period."  *Id.*  In other words, the ambiguity did not affect the rights of the insured and could not be construed in a way that favored the insured.  *Id.*

Here, too, Plaintiffs have not identified a reading of the clause that vindicates their position or any ambiguity that directly affects the rights at issue.  For example, although "Cost of Defense" is not defined, this omission does not mean that Plaintiffs automatically win—instead, it simply means that the term "Cost of Defense" should be accorded its

---

[6] During oral argument, CCRRG's counsel suggested that because the 2012 Policy's definition of "Pay" only contemplates the payment of a damage award, it should not be construed as affecting the scope of CCRRG's duty to pay "Cost of Defense."  The difficulty with this argument is that the insuring agreement in Coverage A, paragraph 1 uses the term "Pay" in relation to both categories of obligations: "We will 'Pay' amounts within policy limits for 'Damages,' 'Cost of Defense,' 'Supplementary Payments' and 'Medical Payments' . . . on behalf of a 'Member' who become legally obligated to 'Pay' 'Damages' and 'Cost of Defense' during the time they are a CCRRG 'Member.'"  (Doc. 56-1 at 2.)  Nevertheless, as discussed in the body of this order, these features of the 2012 Policy do not compel a ruling in Plaintiffs' favor.

ordinary meaning to a layperson. *Equity Income Partners, LP*, 387 P.3d at 1268 ("Arizona law requires that undefined terms be given the meaning used by laypeople in everyday usage . . . ."). *See also New London Cnty. Mut. Ins. Co. v. Nantes*, 36 A.3d 224, 235 (Conn. 2012) ("Words . . . do not become ambiguous simply because a contract fails to define them; even when undefined, words are not ambiguous if common usage or our case law gives them a single meaning."); *Farris v. Ohio Sec. Ins. Co.*, 2017 WL 1390670, *2 n.4 (D. Colo. 2017) ("Plaintiff also asserted that the insurance agreement failed to define the term 'land motor vehicle.' Although this assertion may be accurate, it is irrelevant."); *Fantasia Accesories, Ltd. v. N. Assurance Co. of Am.*, 2001 WL 1478807, *4 (S.D.N.Y. 2001) ("Although the terms of paragraph c are not defined, the language is not ambiguous. 'Misappropriation,' 'advertising ideas,' and 'style of doing business' all appear to be terms to which a layperson would ascribe a definite meaning."). In a related vein, there is no merit to Plaintiffs' contention, advanced during oral argument, that CCRRG's obligation to pay the "Cost of Defense" is less expansive than CCRRG's "Duty to Defend," such that the "Duty to Defend" can remain intact even after the duty to pay the "Cost of Defense" has expired. Plaintiffs did not explain how these duties could diverge and their position runs contrary to the well-settled principle, understandable to a layperson, that, "logically, the burden of the cost of defense should follow the duty to defend." *Frankenmuth Mut. Ins. Co., Inc. v. Continental Ins. Co.*, 537 N.W.2d 879, 880 (Mich. 1995). Thus, under *Sletten*, any ambiguity created by CCRRG's failure to define the term "Cost of Defense" has no effect on this dispute.

Likewise, as for the 2012 Policy's definition of the term "Pay," Plaintiffs' interpretation suggests *greater* limits on CCRRG's duty to defend that go beyond what either party has advocated. Once again, under *Sletten*, this is not the sort of situation where the presence of an alleged ambiguity in an insurance contact compels a ruling in the insured's favor.

It is the continuing membership requirement in Coverage A, paragraph 1, rather than some hypothetical limitation on CCRRG's duty to "'Pay' . . . 'Cost of Defense,'" that

1    is truly at issue here. That requirement is unambiguous. CCRRG was only required to pay

2    "'amounts within policy limits for . . . 'Cost of Defense' *during the time [Capri was] a*

3    *CCRRG "Member.*" (Doc. 56-1 at 2, emphasis added.)

4        Essentially, Plaintiffs ask the Court to ignore Coverage A, paragraph 1 because "a

5    reasonable person would expect that the clause that is specifically devoted to the duty to

6    defend, and which expressly states when that duty ends, controls over the other confusing

7    terms." (Doc. 160 at 6.)[7] But Plaintiffs overlook that courts must "attempt to reconcile

8    and give effect to all terms of the contract to avoid any term being rendered superfluous."

9    *Terrell v. Torres*, 456 P.3d 13, 16 (Ariz. 2020). Of course, insurance contracts should be

10   read from the standpoint of a layperson untrained in the law or the field of insurance, but

11   there is no support in Arizona law for the proposition that an average layperson may ignore

12   particular provisions in an insurance policy or decline to consider the policy in its entirety.

13   *Droz v. Paul Revere Life Insurance Co.*, 405 P.2d 833, 835 (Ariz. Ct. App. 1965) ("We are

14   mindful that in determining whether an ambiguity exists, the language must be considered

15   from the standpoint of one who is not trained in law or in the insurance business. Reading

16   the contract in its entirety, we find no ambiguity.") (citation omitted).

17       In any event, the continuing membership requirement expressed in Coverage A,

18   paragraph 1 is consistent with the rest of the 2012 Policy. The provisions of the

19   subscription agreement, in particular, provide helpful interpretive guidance. As that

20   agreement explains: "CCRRG has no responsibility for any portion of a claim not actually

21   paid during the contract period." (Doc. 13-1 at 58.) Elsewhere, the meaning of "portion

22   of a claim" is clarified to include the duty to defend. (*Id.* at 64-65.) Specifically, the

23   agreement discusses various circumstances in which an insured might lose membership in

---

[7]       During oral argument, Plaintiffs also emphasized that, under *State Farm Mut. Auto. Ins. Co. v. Falness*, 872 P.2d 1233, 1234 (Ariz. 1994), "[a]n analysis of the format and clarity of the policy, as well as the circumstances surrounding its acquisition and issuance, is required to determine whether the exclusion falls outside the reasonable expectations of the insureds." As an initial matter, it is unclear whether this principle applies here because the dispute over the scope of the duty to defend is not a dispute over an exclusion. Nevertheless, for the reasons stated in the text, CCRRG prevails when the "format and clarity" of the 2012 Policy are taken into account.

CCRRG, such as when an insured "fails to pay any Assessment or Dues, Premiums or any payment required by the CCRRG agreement for deferred payment of Surplus Contribution" or "fails to comply with any [other] provision of this Agreement." (*Id.*) In both cases, when an insured loses its membership:

> [T]he *professional liability insurance services* in compliance with and reflected in this agreement shall thereupon terminate, as to all Claims then pending against such former Member . . . . However in the event CCRRG is then providing the *legal defense services* described in compliance with and as reflected in this agreement to such former Member, CCRRG shall continue to provide such legal defense services for a period of time not [to] exceed thirty (30) [sic] to allow for a reasonable period of time to enable such former Member to assume their own legal defense.

(*Id.* at 65, emphases added.) Under these provisions, the insured clearly loses "professional liability insurance services" when it withdraws from membership with CCRRG. The parallel construction of this clause also makes clear that "legal defense services" are a subset of the same "professional liability insurance services" being terminated. These portions of the subscription agreement are thus consistent with CCRRG's proffered interpretation of Coverage A, paragraph 1 and underscore that CCRRG was only required to provide Capri with "Cost of Defense" during the time that Capri remained a CCRRG member.

To the extent Plaintiffs imply that Capri lacked proper notice of the subscription agreement or that Capri was otherwise not bound by that agreement, those arguments are unpersuasive. Although Plaintiffs note that the subscription agreement was "signed by a former Capri executive, Don Pierce, years before the triggered 2012 Policy" (Doc. 167 at 3), they do not explain how that fact changes Capri's rights and obligations under the agreement. As CCRRG pointed out during oral argument, Capri's execution of the subscription agreement was a prerequisite to its ability to obtain the 2012 Policy. Moreover, both the 2012 Policy and the 2013 Policy frequently reference the subscription agreement, and the Court previously found that "[t]hose Policies also incorporate the Subscription Agreement." (Doc. 149 at 18. *See also* Doc. 56-1 at 18 [2012 Policy: "This policy and the . . . signed Subscription Agreement contain all the agreements between

'Member' and us concerning the insurance afforded."].)  Plaintiffs do not explain why provisions in the subscription agreement should be ignored except to say that "extrinsic and collateral document[s] incorporated into the Policy only by reference" are not "where an ordinary insured would look to check on its rights."  (Doc. 167 at 3.)  However, during oral argument, Plaintiffs acknowledged that the subscription agreement is not extrinsic evidence.  Plaintiffs' position thus runs afoul of the obligation to give effect to every provision of a written agreement.  *ELM Ret. Ctr., LP v. Callaway*, 246 P.3d 938, 942 (Ariz. Ct. App. 2010) ("[E]ach part of a contract must be read together, to bring harmony, if possible, between all parts of the writing.") (cleaned up).  *See also* 17A C.J.S. *Contracts* § 419 (2024) ("Matters incorporated into a contract by reference are as much part of the agreement as if they had been set out in the contract verbatim.").[8]

### B.    **Ongoing Duty To Defend**

#### 1.    The Parties' Arguments

Plaintiffs argue that "under the wording of the operative insuring clause, including the express language describing CCRRG's duty to defend and, more particularly when the duty ends, CCRRG obligated itself to continue to defend so long as the insured kept the triggered policy in place and renewed the policy at least once."  (Doc. 160 at 4.)  This argument is premised on subsection b of Coverage A, paragraph 2 of the 2012 Policy, which provides:

> Our right and duty to defend ends when we have exhausted the applicable limit of insurance by the payment of "Cost of Defense", "Supplementary - Payments," "Medical Payments," or "Damages" under this Policy or, when this policy is cancelled or not renewed for any reason, provided however, in the event CCRRG is paying "Cost of Defense" or "Supplementary Payments" for a "Claim" CCRRG shall continue to pay "Cost of Defense" and/or "Supplementary Payments" for all such "Claims" for a period of time not to exceed thirty (30) days to enable such former "Member" to assume its own legal defense.

(Doc. 56-1 at 2.)  Plaintiffs focus on the phrase "[o]ur right and duty to defend ends when

---

[8]    As discussed earlier in this order, CCRRG would prevail on the continuing membership issue even if the analysis were limited to the 2012 Policy document itself— the subscription agreement simply underscores why CCRRG's position is correct.

we have exhausted the applicable limit of insurance . . . or, when this policy is cancelled or not renewed for any reason." (Doc. 167 at 2.) According to Plaintiffs, this provision outlines the only three ways that CCRRG's duty to defend Capri could have been terminated. (Doc. 178 at 4 ["[CCRRG's position] requires the Court to read into the duty to defend clause, a fourth, unstated, ground for terminating a previously existing duty to defend."].) This interpretation, according to Plaintiffs, is reinforced by the dictionary definition of the word "this," which makes clear that "'this policy' as used in the Duty to Defend clause necessarily refers only to the 2012 policy that responded to and provided potential coverage to [Plaintiffs'] claim." (Doc. 167 at 2.) So, according to Plaintiffs, "CCRRG was obligated . . . to continue to provide a defense so long as the policy limit was not exhausted and the 2012 Policy was kept in force throughout its term and was then renewed." (Doc. 167 at 1.) Plaintiffs also identify other provisions of the 2012 Policy in support of this interpretation. (Doc. 160 at 4-6.) For example, Plaintiffs note that CCRRG provided a "conspicuous" disclaimer at the beginning of the 2012 Policy "that any duty to indemnify for 'Damages' only applies to amounts that become due and owing during membership" but did not provide any similar warning regarding the duty to defend. (*Id.* at 4.) Plaintiffs also argue that the definition of "Claims-paid" in the 2012 Policy evinces a broad duty to defend because that definition explicitly mentions defense costs but does not include any indication that the duty to defend will end "when a later issued policy is cancelled." (*Id.*) Plaintiffs also incorporate by reference their previous arguments concerning the Bankruptcy Clause, arguing that "Capri's insolvency and bankruptcy cannot be a basis for relieving CCRRG from its then existing duty to defend and cannot be considered an expansion of its duty to defend." (*Id.* at 3.) According to Plaintiffs, "the Bankruptcy Clause and Claims Paid clauses should be read together and harmoniously . . . . [T]he Bankruptcy Clause precludes application of the continuing membership conditions where the insured is unable to continue its membership with CCRRG due to its insolvency or bankruptcy." (Doc. 131 at 8.)

In response, CCRRG argues that the "introductory notice" does not create ambiguity

because it "alone does not provide policy coverage, and is just a notice of certain terms in the Policy that follow." (Doc. 165 at 5-6.) CCRRG also contends that the introductory notice is not comprehensive because "[i]t is impractical for CCRRG to have disclosed all of the terms of its 39-page Policy and 21-page Subscription agreement . . . in the Introductory Notice, and the absence of certain terms from the Notice . . . does not make them inapplicable when considering the Policy as a whole and giving effect to every word." (*Id.* at 6, citation omitted.) As for the Bankruptcy Clause, CCRRG argues that "this Court has also already considered, and rejected, [Plaintiffs'] efforts to create an ambiguity by reading the Bankruptcy Clause in isolation from the Insuring Agreement . . . [and] the Court's analysis applies similarly in the duty to defend as in the duty to indemnify." (*Id.* at 6.) According to CCRRG, Plaintiffs are arguing that "because Capri's cancellation was purportedly due to its bankruptcy . . . allowing CCRRG to terminate its defense obligation would be tantamount to relieving CCRRG of an existing obligation," which the Bankruptcy Clause prohibits. (*Id.* at 9.) This cannot be the case, CCRRG argues, because "Capri did not file bankruptcy during the 2012 Policy period" and because CCRRG did not have an ongoing duty to defend Capri under the 2012 Policy. (*Id.*)

In reply, Plaintiffs assert that their proffered interpretation is consistent with the "upper case and bolded notice language on page one of the policy," which "conspicuously references only the duty to indemnify for 'Damages' that become due and owing during membership" and "contains no such limitations as to CCRRG's continuing duty to defend." (Doc. 178 at 3.)

## 2.    Analysis

Plaintiffs correctly point out that subsection b of Coverage A, paragraph 2 identifies three ways that CCRRG's duty to defend might be terminated: (1) when the policy limits are exhausted; (2) when an insured cancels the policy; or (3) when the insured fails to renew the policy. However, Plaintiffs do not explain why this list is necessarily exclusive or why the termination options in that paragraph cannot coexist with the continuing membership requirement identified by CCRRG in nearby, related provisions. An insurance

policy "must be read as a whole, so as to give a reasonable and harmonious effect to all of its provisions." *Charbonneau*, 634 P.2d at 975. When considering the 2012 Policy as a whole and giving harmonious effect to each of its terms, Plaintiffs have not shown that CCRRG was required to defend Capri after Capri ceased being a CCRRG member. *Keggi*, 13 P.3d at 788 ("Generally, the insured bears the burden to establish coverage under an insuring clause.").

The introductory provision of the 2012 Policy does not compel a different conclusion. Although the upper case and bolded language at the beginning of the 2012 Policy does not identify when CCRRG's duty to defend ends, there is no reason why this introductory provision should be construed as covering every important aspect of the Policy. As noted, "[i]n interpreting a contract, we attempt to reconcile and give meaning to all its terms." *Weatherguard Roofing Co., Inc. v. D.R. Ward Const. Co., Inc.*, 152 P.3d 1227, 1231 (Ariz. Ct. App. 2007). It is perfectly logical, then, that the 2012 Policy's introductory provision would leave more detailed exposition of precise terms for later. *ELM Ret. Ctr., LP*, 246 P.3d at 942 ("[B]ecause specific contract provisions express the parties' intent more precisely than general provisions, specific provisions qualify the meaning of general provisions."). This analysis applies equally to Plaintiffs' argument concerning the 2012 Policy's definition of "Claims-paid."

To the extent Plaintiffs incorporate their previous arguments concerning the Bankruptcy Clause, those arguments are unavailing. Under the Bankruptcy Clause, the insolvency or bankruptcy of a member-insured can neither "expand" CCRRG's coverage obligations nor "relieve" CCRRG of its coverage obligations. (Doc. 13-1 at 32.) As discussed above, CCRRG did not have a duty to defend Capri after it ceased being a CCRRG member, so Capri's bankruptcy cannot be said to have "relieved" CCRRG of an otherwise applicable duty. Moreover, requiring CCRRG to continue defending Capri after its bankruptcy-induced membership cancellation would be tantamount to "expanding" Capri's coverage based on the Bankruptcy Clause. For the same reasons provided in the previous summary judgment order, such an outcome is impermissible. (Doc. 149 at 17-

1    19.)[9]

2    IV.    Pursuit Of A Duty-To-Defend Claim In A Garnishment Action

3            Although the analysis could end there, CCRRG also seeks summary judgment on

4    an alternative legal ground that has nothing to do with the merits of Plaintiffs' duty-to-

5    defend claim.  According to CCRRG, "[a]bsent an assignment of Capri's contract rights,

6    [Plaintiffs] do not have a right to raise the breach of a duty to defend question in this

7    garnishment action."  (Doc. 162 at 13.)  In support, CCRRG cites *McCandless v. United S.*

8    *Assurance Co.*, 953 P.2d 911 (Ariz. Ct. App. 1997), and *Ring v. State Farm Mut. Ins. Auto.*

9    *Ins. Co.*, 708 P.2d 457 (Ariz. Ct. App. 1985).  (*Id.*)  CCRRG also contends that "[t]here is

10   not a single case in Arizona that allowed a judgment creditor to recover damages for breach

11   of the duty to defend without indemnity coverage."  (*Id.*)  In response, Plaintiffs do not

12   identify any Arizona case authorizing this approach but argue there is no reason why they

13   should be precluded from pursuing it.  (Doc. 167 at 5-6.)  As for *McCandless*, Plaintiffs

14   argue that the passage cited by CCRRG is "footnoted dicta" that was wrongly decided.  (*Id.*

15   at 6.)  CCRRG offers no further arguments in reply.

16           Acknowledging that Arizona law is not a model of clarity on this issue, the Court

17   concludes that CCRRG's position is correct.  The parties have not cited, and the Court has

18   not identified through its own research, any case in Arizona history in which the plaintiff

19   in a garnishment action was allowed to pursue a duty-to-defend claim against the insurer

20   of a judgment debtor even though the insurer had no obligation to provide indemnification

21   for the underlying judgment.  This silence, although not dispositive, is telling.

22           Additionally, to the extent Arizona courts have said anything about the

23   permissibility of this approach, they have suggested it is verboten.  In *McCandless*, the

24   plaintiff "was seriously injured when the vehicle he was driving collided with a tractor-

25   trailer combination owned by TWS and driven by its employee, James B. Clegg."  953

26   P.2d at 913.  At the time of the accident, TWS held an insurance policy, issued by United

27

28   ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
     [9]    Given these conclusions, it is unnecessary to resolve CCRRG's alternative argument
     that Plaintiffs' duty-to-defend claim fails for lack of damages.

Southern Assurance Company ("USAC"), that also covered "anyone using a covered vehicle with TWS' permission." *Id.* at 912-13.  Following the accident, McCandless sued TWS and Clegg, but USAC failed to provide a defense despite having notice of the action. *Id.* at 913.  As a result, McCandless eventually secured a $2.7 million default judgment against each defendant.  *Id.*  Afterward, McCandless brought a pair of related garnishment actions against USAC, arguing in each case "that the USAC policy provided coverage for the underlying" judgment and that USAC should be "liable in the amount of $750,000, its policy limits."  *Id.*  The trial court agreed, ordering USAC to pay $750,000 to McCandless, and also ordered USAC to pay post-judgment interest on the entire $2.7 million.  *Id.*  On appeal, the Arizona Court of Appeals affirmed as to the entry of the $750,000 judgment against USAC but reversed as to the interest issue, holding that "the proper rule of law is that where the policy has no provision for payment of interest on a judgment entered against the insured, interest must be calculated on the policy limits, not the amount of the underlying judgment."  *Id.* at 919.  In reaching this conclusion, the court rejected McCandless's argument "that USAC should still be liable for interest because this is a case in which USAC *should* have provided a defense for its insured," explaining: "This argument is, in essence, a claim that USAC breached its duty under the policy to defend its insureds.  However, we do not find that such a claim was an issue litigated or decided in the trial court and the issue is thus not before us."  *Id.* at 920.  In a footnote, the court added: "Moreover, *we question whether breach of a duty to defend could even be raised by McCandless in this garnishment action*.  McCandless has no assignment of a claim from Clegg or TWS of any cause of action under the policy."  *Id.* at 920 n.12 (emphasis added).

The Court construes this footnote as suggesting that Arizona law does not permit the plaintiff in a garnishment action from pursuing a duty-to-defend claim against the insurer of a judgment debtor, which is exactly what Plaintiffs are attempting to do here.  Plaintiffs seek to avoid this conclusion by characterizing the above-cited passage from *McCandless* as "footnoted dicta."  (Doc. 167 at 6.)  This argument overlooks that "in diversity cases, we are generally bound by the dicta of state courts."  *Homedics, Inc. v.*

*Valley Forge Ins. Co.*, 315 F.3d 1135, 1141 (9th Cir. 2003).  *See also CRST Van Expedited, Inc. v. Werner Enterprises, Inc.*, 479 F.3d 1099, 1110 n.12 (9th Cir. 2007) ("We are aware of the problems with relying on dicta in judicial opinions.  However, as a federal court sitting in diversity, we are generally bound by the dicta of state courts.") (citation omitted).

Nor is there any merit to Plaintiffs' contention, raised during oral argument, that because the text of the garnishment statute only places one restriction (related to earnings) on a judgment creditor's ability to seek relief against a garnishee who owes an indebtedness to a judgment debtor—it authorizes garnishment when "the garnishee is indebted to the judgment debtor for monies that are not earnings," A.R.S. § 12-2572(2)—this means there should be no other limits on the legal theories a judgment creditor may advance in a garnishment proceeding.  Whatever force this textual argument may have in a vacuum, it is inconsistent with *Ring*, in which the Arizona Court of Appeals held that additional limits do exist: "[A]n injured plaintiff may not bring garnishment proceedings against an insurer for an alleged bad faith failure to settle without an assignment of the insured's rights."  708 P.2d at 462.  During oral argument, Plaintiffs acknowledged that if their theory as to the proper statutory interpretation of § 12-2572 were correct, this would mean *Ring* was wrongly decided.

It would be one thing if Plaintiffs could point to conflicting holdings or even conflicting dicta from other Arizona courts suggesting that the approach they are pursuing here is permissible, but Plaintiffs have not done so.[10]  Thus, the Court is left with a legal landscape in which no Arizona court has ever approved Plaintiffs' approach; the one

---

[10]    The Court does not construe the Arizona Supreme Court's decision in *Benson v. Casa De Capri Enterprises, LLC*, 502 P.3d 461 (Ariz. 2022), which was issued following an earlier certification request in this case, as providing any support for the duty-to-defend theory that Plaintiffs now seek to pursue.  Although the Arizona Supreme Court did not directly opine on the propriety of that theory, certain passages from the opinion seem to suggest, consistent with *McCandless* and *Ring*, that the plaintiff in a garnishment action may only pursue relief against the insurer of a judgment debtor under the theory that the insurer was contractually obligated to provide *indemnification* for the underlying judgment.  *Benson*, 502 P.3d at 465-66 ("[I]f the debt is contested, as is the case here, the judgment creditor must prove that the insurer *was obligated to insure the loss* under the insurance agreement.  This does not mean that the Bensons are bound by or effectively parties to the insurance contract, but rather they have standing to *access the funds* to the extent the original insured could have.") (emphases added).

Arizona appellate court that has considered the exact issue has suggested, albeit in dicta, that the approach is impermissible; and another Arizona court has issued a decision that rejects Plaintiffs' underlying theory of statutory interpretation.  It is difficult to see how the Court could rule in Plaintiffs' favor under these circumstances.  *Ryman v. Sears, Roebuck & Co.*, 505 F.3d 993, 994 (9th Cir. 2007) ("Today we reiterate the rule that when (1) a federal court is required to apply state law, and (2) there is no relevant precedent from the state's highest court, but (3) there *is* relevant precedent from the state's intermediate appellate court, the federal court must follow the state intermediate appellate court decision unless the federal court finds convincing evidence that the state's supreme court likely would not follow it.").  In a related vein, to the extent Plaintiffs argue that *Ring* and/or footnote 12 from *McCandless* were wrongly decided—"while the footnote in *McCandless* cited by CCRRG did raise a question of whether breach of a duty to defend could be raised by a judgment creditor in a garnishment absent an assignment, it cited only to . . . a third party bad faith lawsuit to support its concern . . . [and] did not explore in the least the significant differences between debt owed by a garnishee to a judgment debtor arising from a breach of contract and an obligation based on bad faith liability" (Doc. 167 at 6, emphasis omitted)—a federal court has no license to disregard state law on this basis.  *Ryman*, 505 F.3d at 995 ("The district court did not cite any evidence that the Oregon Supreme Court would disaffirm [the Oregon Court of Appeals' decision in] *Yeager*.  It merely disagreed with *Yeager*.  Because there is no evidence that the Oregon Supreme Court would have decided the . . . issue differently, the district court erred in not applying the *Yeager* rule.") (citations omitted).[11]

 …

 …

 …

 …

---

[11] Given these conclusions, it is unnecessary to resolve CCRRG's alternative argument that Plaintiffs should be judicially estopped from pursuing a duty-to-defend claim.

1    Accordingly,

2    **IT IS ORDERED** that Plaintiffs' motion for summary judgment (Doc. 160) is

3 **denied** and CCRRG's motion for summary judgment (Doc. 162) is **granted.**

4    **IT IS FURTHER ORDERED** that the Clerk enter judgment accordingly and

5 terminate this action.

6    Dated this 10th day of December, 2024.

7

8

9    _____

10                    Dominic W. Lanza
                 United States District Judge